SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
JUSTICE WECHT
In this appeal, we consider whether the trial evidence sufficed to support a conspiracy conviction, as well as derivative convictions for aggravated assault with a deadly weapon and possessing instruments of crime. The case involves a street fight into which additional persons entered. We hold that, under the particular circumstances of this case, the Commonwealth did not meet its evidentiary burden of proof beyond a reasonable doubt.
On May 15, 2014, Calvin Wilson drove his girlfriend, Carol Mitchell, and her two grandchildren to his apartment complex on North 15th Street in Philadelphia. As Wilson approached the driveway to the complex, he noticed Richard Chambers standing next to a white Jeep. Wilson recognized Chambers as a resident of one of the buildings within the apartment complex. Chambers was leaning into the driver's side window, having a conversation with the occupants of the Jeep. The driveway is a narrow strip of pavement that is wide enough for only one vehicle to pass at a time. The Jeep was partially blocking the driveway, preventing Wilson from passing freely into the complex.
Wilson honked his vehicle's horn at Chambers and the occupants of the Jeep. He then rolled down his window and yelled to Chambers, "Why are you blocking the driveway? Can you move from the driveway?" Notes of Testimony ("N.T."), 3/23/2015, at 13. After receiving no response, Wilson "hollered out" to the occupants of the Jeep, "Can you back up so I can get up into the driveway?" Id. Chambers remained silent, but gave Wilson a "nasty look." Id.
Unsuccessful in his efforts, Wilson drove up on the curb and squeezed his vehicle past the Jeep without making contact with it. However, as he passed Chambers, "words were exchanged." Id. at 14. Wilson parked his car and approached Chambers, continuing to press Chambers as to why he and the Jeep were impeding access to the driveway. The two men walked toward each other as their verbal spat escalated. As Wilson got closer to the Jeep, he noticed at least two women inside. Finally, Wilson and Chambers met, and "fists were flying." Id. at 18. According to Wilson, Chambers threw the first punch and Wilson retaliated in kind to defend himself. Id. at 34.
Early in the fight, one of Chambers' blows struck Wilson in the face. Once the altercation became physical, Carol Mitchell attempted to intervene in an effort to stop the fight. However, as she did, "everybody jumped in." Id. at 48. Mitchell observed *404 that "[t]hey came from that [Jeep]. It was one male in that car and it was a bunch of thick women." Id. at 49. Someone then approached Wilson from behind, tore the eyeglasses from his face, and began scraping and scratching Wilson's cheek and forehead. Wilson continued to throw aimless punches in an attempt to defend himself from the now multi-assailant attack, but to little (or no) avail. He then was taken to the ground. Chambers climbed on Wilson's back, pinned Wilson down, and began striking Wilson repeatedly in the ribs and midsection. While Wilson was underneath Chambers, a woman wearing floral-patterned shoes sprayed mace in Wilson's face. Mitchell could not identify the woman spraying the mace, but she observed that the person was macing Wilson continuously as he struggled with Chambers. Other than the mace, Mitchell did not see any other weapons wielded during the fight.
Philadelphia Police Officer Henry Schoch arrived on the scene of the fight in response to a "911 complaint for a person with a weapon," whereupon he encountered a "pile of people." Id. at 58. The officer exited his marked police cruiser and approached the ongoing scrum. As he got closer, the officer observed Chambers kneeling on Wilson's chest, punching a flailing Wilson in the face. Officer Schoch did not observe any of the other people hitting or striking Wilson. In fact, when he arrived, the females in the group were yelling at Chambers to get off of Wilson. Officer Schoch immediately grabbed Chambers and pulled him off of Wilson. Wilson started to walk away in the direction of his vehicle. Officer Schoch went after Wilson, grabbed him, and placed him in handcuffs. The officer then returned to Chambers, who was "enraged," repeatedly shouting that he "was going to kill" Wilson. Id. at 59. Officer Schoch then handcuffed and detained Chambers.
Wilson emerged from the fight with a gash across his face. Wilson told Officer Schoch that the gash had been inflicted by a knife. Someone described the weapon to Officer Schoch as a silver knife. Officer Schoch did not find any knife at the scene. Jeffrey Jones, a defense witness at trial, testified that he was in his apartment when the fight broke out. From his window, he saw Wilson, whom Jones described as "a huge gentleman," N.T. at 76, aggressively approach Chambers. According to Jones, Chambers grabbed Wilson by the legs and took him to the ground. Jones exited his residence and, as he ran toward the fight, heard Chambers screaming repeatedly that Wilson had a knife. Jones testified that Chambers yelled at him to find the knife. Jones searched the area, but found nothing resembling a knife.
Back-up police units arrived shortly thereafter. Officer Schoch placed Wilson in the back of a police wagon and splashed water on Wilson's face in an attempt to flush the pepper spray from his eyes.[1] Still handcuffed, Wilson was placed in an ambulance and driven to a local hospital. At the hospital, Wilson was diagnosed with three broken ribs, a burned retina, a concussion, and a laceration above his eye that required sutures. As a result of the pepper spray, Wilson suffered sustained "drooling" from his eye. N.T. at 24.
Based upon his observations and his investigation, Officer Schoch opted not to charge Wilson with any crime, and instead charged Chambers with aggravated assault, 18 Pa.C.S. § 2702(a), criminal conspiracy, *405 18 Pa.C.S. § 903, possessing instruments of crime, 18 Pa.C.S. § 907(a), terroristic threats, 18 Pa.C.S. § 2706(a)(1), simple assault, 18 Pa.C.S. § 2701(a), and recklessly endangering another person, 18 Pa.C.S. § 2705. Chambers waived his right to a jury trial, and proceeded to a bench trial on March 23, 2015, before the Honorable Sierra Thomas Street. Following presentation of the evidence, Chambers' counsel argued in closing that Chambers' actions constituted, at most, misdemeanor simple assault. See 18 Pa.C.S. § 2701(b)(1) ("fight or scuffle entered into by mutual consent"). Judge Street rejected this argument, and informed Chambers' counsel that the trial court viewed the criminal liability determination as amounting to a decision between aggravated assault-serious bodily injury, a first-degree felony, 18 Pa.C.S. § 2702(a)(1), (b), and aggravated assault with a deadly weapon, a second-degree felony, 18 Pa.C.S. § 2702(a)(4), (b). In response to this judicial direction, Chambers' counsel argued that Wilson suffered no serious injury, and that Wilson sustained only bodily injury (which is all that is necessary for aggravated assault with a deadly weapon), because Wilson spent only a brief time in the hospital and suffered no permanent or long-lasting harm. The Commonwealth argued that, at a minimum, Chambers attempted to cause seriously bodily injury, which suffices to prove aggravated assault as a first-degree felony.
For purposes of aggravated assault with a deadly weapon, the trial court determined that the mace-not the alleged knife-deployed by one of Chambers' female companions constituted a deadly weapon. This conclusion was essential to the theories upon which the trial court's verdicts could rest. For purposes of aggravated assault-serious bodily injury, the trial court could only have convicted Chambers as a principal actor. However, because it was one of the women, and not Chambers, who wielded the deadly weapon (the mace), the trial court could not convict Chambers as a principal actor on the offenses of aggravated assault with a deadly weapon and possessing instruments of crime. For these convictions, the court had to be satisfied beyond a reasonable doubt either: (a) that Chambers was an accomplice; or (b) that Chambers was a conspirator with the mace-deploying woman, and thus was guilty based upon the theory of conspiratorial liability, which permits vicarious criminal liability for the substantive offenses committed by other members of the conspiracy that are undertaken in furtherance of the conspiracy.[2] The Commonwealth did not seek a verdict based upon either of these theories. The Commonwealth did not charge Chambers as an accomplice. See Criminal Information, 6/9/2014, at 1. Instead, the Commonwealth argued that Chambers should be convicted as a principal actor who either inflicted serious bodily injury or attempted to cause serious bodily injury by his own actions.
The trial court found Chambers guilty of aggravated assault with a deadly weapon, conspiracy, possessing instruments of crime, terroristic threats, simple assault, and recklessly endangering another person.
*406 As the trial court later explained in its Pa.R.A.P. 1925(a) opinion, for both aggravated assault with a deadly weapon and possessing an instrument of crime, because Chambers never used or possessed the mace, his convictions were premised upon a theory of conspiratorial liability. That is, the trial court found that Chambers was criminally liable for the acts of his co-conspirators, which acts were undertaken in furtherance of the criminal objective. The trial court did not base its verdicts upon a theory of accomplice liability.
On June 4, 2015, the trial court sentenced Chambers to one and one-half to three years' incarceration on the aggravated assault conviction, followed by a consecutive thirty-six month term of probation on the possessing an instrument of crime conviction. The trial court imposed no further penalty on the remaining convictions. Chambers timely filed post-sentence motions, which the trial court denied.
On July 29, 2015, Chambers filed a notice of appeal. Once the trial transcripts were produced, the trial court directed Chambers to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). In his timely concise statement, Chambers alleged, inter alia , that the evidence was insufficient to prove the existence of a conspiracy beyond a reasonable doubt such that he could be convicted of substantive offenses committed by another person. He also argued that the evidence was insufficient to prove accomplice liability.[3]
On February 19, 2016, the trial court issued a Rule 1925(a) opinion in response to Chambers' statement. After correctly reciting the governing standards for evaluating a challenge to the sufficiency of the evidence and the statutory elements and governing legal precepts of criminal conspiracy, see Tr. Ct. Op. at 15-16, 19-20, the trial court determined that the evidence adequately established the existence of a conspiracy between Chambers and the woman who sprayed mace in Wilson's face. The trial court noted that, when Wilson first arrived on the scene, Chambers was talking to the women sitting in the Jeep. The court then opined that, once the fight commenced, Chambers and the women with whom he was conversing just before the fight proceeded to act in concert to assault Wilson. Ultimately, it was the apparent pre-existing relationship between Chambers and the women that led the trial court to conclude that a conspiracy had been formed between them to effectuate a shared intent to assault Wilson. Id. at 22 ("Under the circumstances of this case, there was sufficient evidence to conclude that [Chambers] and a group of others by way of their relationship to each other agreed to commit a crime, and, with shared intent, committed overt acts in furtherance of the conspiracy to physically assault [Wilson] through the use of mace." (emphasis added) ).
Having found sufficient evidence that Chambers had entered into a conspiracy with the women who possessed the mace and who sprayed it in Wilson's face, the trial court further found that, as a conspirator, Chambers also was guilty of both possessing an instrument of crime and aggravated assault, even though Chambers *407 did not personally commit those offenses. As to those two crimes, Chambers had alleged that the Commonwealth failed to prove him guilty as either a conspirator or as an accomplice. The trial court rejected both challenges, relying entirely upon its conspiracy discussion, in which the court never referenced accomplice liability. See id. at 22 (rejecting a sufficiency challenge to the aggravated assault conviction and stating that "this court disagrees as outlined above," referring to the court's conspiracy analysis); 24 ("As discussed earlier in this opinion, this court found that there was sufficient evidence that [Chambers] was a co-conspirator to the assault using mace on [Wilson]."). The Commonwealth never alleged, nor attempted to prove, that Chambers was an accomplice, and the trial court never held that he was.
Nonetheless, in a published opinion, the Superior Court explained that, because "the evidence is uncontroverted that [Chambers] did not spray the mace, [Chambers'] convictions rest upon a theory of accomplice liability." Commonwealth v. Chambers , 157 A.3d 508, 513 (Pa. Super. 2017). Unlike the trial court, the Superior Court outlined the statutory elements of accomplice liability, which are codified at 18 Pa.C.S. § 306.[4] In a brief analysis, the Superior Court determined that Chambers was an accomplice to the floral-shoed woman because, "when he began punching [ ] Wilson, [he] prompted one or more of his unidentified cohorts to spray mace at [ ] Wilson, and is therefore criminally liable as an accomplice for their acts." Chambers , 157 A.3d at 514.
The Superior Court then turned its attention to the theory of conspiratorial liability. The panel summarized the law of conspiracy and held that, as to both aggravated assault with a deadly weapon and possessing instruments of crime, Chambers was "criminally liable for the actions of his cohorts because he was a full participant in a conspiracy." Id. at 516. The Superior Court then cited the oft-repeated precept, the viability of which was a potential inquiry in the case sub judice , that "conspirators are responsible for one another's actions." Id. (citing Commonwealth v. Saunders , 946 A.2d 776, 781 (Pa. Super. 2008) (explaining that the actions of one co-conspirator may be imputed to another conspirator, and that a conspirator is criminally *408 responsible for those actions of his co-conspirator that are accomplished in furtherance of the common design) ). The Superior Court agreed with the trial court's analysis, and concluded that the trial court did not err in holding Chambers liable "as both an accomplice and a conspirator," id. at 515, notwithstanding that the trial court did not find Chambers responsible as an accomplice.
Chambers then filed a petition for allowance of appeal with this Court. On September 6, 2017, we granted review in order to address the following issues, as stated by Chambers:
(1) Is not the Superior Court's holding in a published opinion that a defendant can be liable for the underlying conduct by another by virtue of being a co-conspirator inconsistent with the plain language of the governing statute, 18 Pa.C.S. § 306, which provides for accomplice liability only, and with this Court's decision in Commonwealth v. Knox , 629 Pa. 467, 105 A.3d 1194 (2014) ?
(2) Did not the Superior Court erroneously analyze accomplice liability, and incorrectly conclude that the evidence was sufficient to convict on that theory?
(3) Did not the Superior Court err in concluding that the evidence was sufficient to convict [Chambers] of conspiracy to assault the victim with [m]ace under 18 Pa.C.S. § 903, since he neither intended nor agreed to commit this crime?
Commonwealth v. Chambers , --- Pa. ----, 170 A.3d 1030 (2017) (per curiam ).
Chambers was convicted of, inter alia , the following crimes: criminal conspiracy, aggravated assault with a deadly weapon, and possessing instruments of crime. It is undisputed that Chambers never held or deployed the canister of mace. Thus, as to the latter two offenses, the trial court convicted Chambers based upon the principle of conspiratorial liability, a theory in which one conspirator is criminally liable for the substantive offenses committed by other members of the conspiracy that are undertaken in furtherance of the conspiracy. See, e.g., Commonwealth v. Smith , 604 Pa. 126, 985 A.2d 886, 896 (2009) (finding evidence sufficient for first-degree murder when fatal shot was fired by co-conspirator); Commonwealth v. Montalvo , 598 Pa. 263, 956 A.2d 926, 932 (2008) (holding that each member of a conspiracy to commit murder can be convicted of first-degree murder, regardless of who actually killed the victim); Commonwealth v. Boxley , 575 Pa. 611, 838 A.2d 608, 612 (2003) (same). This form of vicarious criminal liability is not codified in Pennsylvania's Crimes Code. See 18 Pa.C.S. § 306 (outlining the circumstances in which a person can be liable for conduct of another, which contains no mention of the concept of conspiratorial liability); § 903 (setting forth the elements of the substantive offense of criminal conspiracy, and again, omitting any reference to an offender's liability for acts committed by others in furtherance of the conspiracy). Yet, the maxim routinely is utilized in courtrooms across Pennsylvania as a basis to convict one person for the acts of another, and is faithfully applied by this Court. See Smith , Montalvo , Boxley , supra .[5]
*409 At issue in this case, in part, is the question of whether such common law liability exists in our statutorily codified system of substantive criminal law. However, before we may proceed to that inquiry, there must be a conspiracy. It is axiomatic that without a conspiracy there can be no conspiratorial liability. Chambers alleges that the evidence at his trial was insufficient to prove that a conspiracy existed. For this reason, we commence our analysis with Chambers' argument that the Commonwealth failed to prove beyond a reasonable doubt that he and the mace-wielding woman engaged in a conspiracy to assault Wilson.
Following a close evaluation of the evidence presented at trial, we agree with Chambers, as we conclude that the Commonwealth failed to prove the existence of a conspiracy beyond a reasonable doubt. Having found no conspiracy, we must leave for another day the more difficult question of whether criminal convictions can rest upon the theory of conspiratorial liability, when such theory is not provided for expressly in our Crimes Code.[6] Challenges to the sufficiency of the evidence are governed by our familiar and well-established standard of review. We consider the evidence presented at trial de novo . Commonwealth v. Sanchez , 623 Pa. 253, 82 A.3d 943, 967 (2013). We are obliged to evaluate that evidence in the light most favorable to the Commonwealth, as the verdict winner, and we draw all reasonable inferences therefrom in the Commonwealth's favor. Through this lens, we must ascertain whether the Commonwealth proved all of the elements of the crime at issue beyond a reasonable doubt. Id. This is a question of law. Commonwealth v. Weston , 561 Pa. 199, 749 A.2d 458, 462 (2000). Our scope of review is plenary. Sanchez , 82 A.3d at 967.
Conspiracy is defined in our Crimes Code as follows:
(a) Definition of conspiracy.-A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
18 Pa.C.S. § 903(a).
In order to prove the existence of a criminal conspiracy, the Commonwealth must demonstrate that the defendant:
*410 "(1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." Commonwealth v. Rios , 546 Pa. 271, 684 A.2d 1025, 1030 (1996) ; see 18 Pa.C.S. § 903. Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy. Commonwealth v. Miller , 469 Pa. 24, 364 A.2d 886, 887 (1976).
At "the heart of every conspiracy" lies the "common understanding or agreement" between the actors. Commonwealth v. Kennedy , 499 Pa. 389, 453 A.2d 927, 929 (1982) (citations omitted). "Implicit in any conspiracy is proof ... that an accused agrees to participate in the alleged criminal activity." Commonwealth v. Derr , 501 Pa. 446, 462 A.2d 208, 210 (1983). The criminal union being prosecuted cannot be based upon an agreement to complete a broad, undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective. "The sine qua non of a conspiracy is the shared criminal intent." Weston , 749 A.2d at 463 (citing Commonwealth v. Wayne , 553 Pa. 614, 720 A.2d 456, 464 (1998), quoting Commonwealth v. Schomaker , 501 Pa. 404, 461 A.2d 1220 (1983) ). "Without this common purpose, a conspiracy cannot be maintained." Derr , 462 A.2d at 209.
Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. Commonwealth v. Spotz , 552 Pa. 499, 716 A.2d 580, 592 (1998). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." Commonwealth v. Strantz , 328 Pa. 33, 195 A. 75, 80 (1937). Indeed, "[a] conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed." Kennedy , 453 A.2d at 930.
A conspiracy cannot be established based only upon "mere suspicion and conjecture." Derr , 462 A.2d at 210 (citing Commonwealth v. Dolfi , 483 Pa. 266, 396 A.2d 635 (1979) ). Preexisting relationships or "mere association of participants," without more, will not suffice to establish a prosecutable criminal conspiracy. Kennedy , 453 A.2d at 930 (citing Commonwealth v. Roux , 465 Pa. 482, 350 A.2d 867, 870 (1976) ; Commonwealth v. Eiland , 450 Pa. 566, 301 A.2d 651, 652 (1973) ) (emphasis in original). "Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient" to prove that a particular actor was involved in a criminal conspiracy. Lambert , 795 A.2d at 1016. In other words, even a husband and a wife, a parent and a child, friends, paramours, or siblings are not, by virtue of these close relationships alone, conspirators when acting in concert. The Commonwealth still must demonstrate the formation of an illicit agreement, the attendant specific shared intent to promote or facilitate the object offense, and an overt act. No level of intimacy or history between actors can replace the elements of the offense. These relationships undoubtedly can be a factor to be considered in ascertaining whether an agreement was formed between the actors, and the agreement may be proven by circumstantial evidence. Kennedy , 453 A.2d at 930. Yet, without more, these relationships alone cannot serve as incontrovertible *411 and definitive proof that an illicit agreement existed.
Fights involving multiple participants, particularly those in which a person interjects herself into a brawl after it has commenced, present unique challenges for determining whether a conspiracy existed. As suggested above, direct evidence of the formation of a conspiratorial agreement is rare, and often must be derived from the facts and circumstances of each case. The agreement need not be formal, nor must it even be expressly communicated. It can be established instantaneously, or it can be the product of drawn-out deliberations. By way of example, in the context of multi-person fights, two participants can form a conspiracy to assault another person by discussing at length a plan to assault that person, or, alternatively, those same individuals can form the illicit agreement by mere nodding of heads, so long as they possess the requisite intent.
A conspiracy can form after one of the actors begins committing a substantive crime, such as an assault. Yet, as is the case here, determining if and when such a conspiracy arose can be difficult. Consider a case in which two people engage in a fight and another person joins in after the fight has begun. If the intervening person decided, entirely upon her own accord, to join the fight, no conspiracy would exist, regardless of her relationship to either combatant. The conspirators must at some point agree (and intend) to commit-or solicit or aid in the planning of-an assault. One joining the fight, but acting only upon her own volition and motivation, does not make a conspiracy.
Nonetheless, even if no conspiracy existed when the third party initially intervened, subsequent events can create a criminal conspiracy. For example, imagine two men fighting each other outside of a bar. A third man, a friend of one of the combatants, sees the fight and decides, on his own, to jump into the fight to help his friend. At that point, because there has not yet been a meeting of the minds, no conspiracy exists. But, imagine next that the original fighter grabs and holds his opponent by the arms and then nods to the intervening friend, who then starts repeatedly punching the restrained man. In that scenario, a conspiracy has formed when the original fighter holds his opponent and nods to the intervening man, even though no conspiracy yet existed at the point when the third man first joined the fight.
Each case must be evaluated on its own set of facts. Despite the variable circumstances under which a conspiracy can form, particularly in assault cases, it is axiomatic and well-established that "persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant to a common plan, agreement, or understanding." Kennedy , 453 A.2d at 930 (citations omitted).
With these principles in mind, we turn to the facts of the case sub judice . We consider, in the light most favorable to the Commonwealth, whether Chambers and the woman who sprayed Wilson with mace conspired to assault Wilson, or whether the woman joined the "affray spontaneously." Id. Our deferential standard of review notwithstanding, we are unable to find the trial evidence sufficient to prove that such a conspiracy existed.
On May 15, 2014, Wilson arrived at his apartment complex, but could not enter because the driveway was partially blocked by a white Jeep. At the time, Chambers was standing at the Jeep's driver's side window, talking to the occupants. Those occupants never were identified at trial, nor did the Commonwealth establish what, if any, relationship existed between them *412 and Chambers, although defense witness Jeffrey Jones indicated at trial that one of the women was Chambers' girlfriend. Eventually, Wilson was able to pass his vehicle by the Jeep by driving partially on the curb of the driveway. Wilson parked his car and immediately confronted Chambers. What began as a verbal confrontation quickly turned physical. Chambers threw the first punch, and Wilson responded in kind in an effort to defend himself.
At that point, Carol Mitchell, Wilson's girlfriend, attempted to intervene and stop the fight. As Mitchell did so, the occupants of the Jeep exited the vehicle and joined the melee. One of them grabbed Wilson from behind, tore his glasses off, and threw him to the ground. At least one woman began to spray Wilson with mace. The record contains no evidence that the actions undertaken by the women who exited the Jeep were pursuant to any form of agreement, spoken or otherwise, between them and Chambers. There is no evidence that Chambers invited their participation, desired to work in tandem against Wilson, or knew that anyone would intervene. By all accounts, the initial argument occurred almost immediately after Wilson parked his car, and involved only Wilson and Chambers, with no participation from those inside the Jeep. The trial testimony does not suggest that Wilson's assailants formed a criminal agreement during the brief period between the time when Wilson parked his car and the moment when the fight began. To the contrary, the occupants of the Jeep did not get involved in the fracas until after Carol Mitchell intervened on Wilson's behalf in an effort to stop the fight. Nothing in the record fairly can be construed to prove that Chambers reached an agreement with the women, or that he knew that they would enter the fray, possessed mace, or would spray it on Wilson.
Although the record does not establish that Chambers initially entered into a conspiracy, one could have been formed by words or actions once the Jeep's occupants joined the fight. Yet, even inferentially, the testimony does not support such a conclusion. As the fight progressed, Wilson was taken to the ground. Chambers climbed on top of Wilson and held him down. But, unlike a scenario in which one person restrains the victim while another assaults him, forming what likely is a criminal conspiracy, there is no evidence that Chambers held Wilson down so that others could join in his assault.[7] No one testified that Chambers restrained Wilson so that a woman could pepper spray Wilson in the face, or for purposes of any other joint action. Instead, both Wilson and Mitchell testified that, while holding Wilson down, *413 Chambers repeatedly punched Wilson in the ribs and midsection. At the same time, a woman was spraying Wilson with mace, but there is no evidence in the record to suggest-or to allow the inference-that Chambers held Wilson down in order to assist the woman. When Officer Schoch arrived, Chambers still had Wilson pinned to the ground, and was continuing to punch Wilson in the face and body. Officer Schoch did not observe anyone else assaulting Wilson at that time. The Commonwealth's evidence indicates only that Chambers held Wilson down so that Chambers himself could continue his own assault, not so that someone else could assault Wilson with a deadly weapon. Consequently, the Commonwealth did not prove that a conspiracy formed when, or after, the female occupants of the Jeep joined the fight.
As noted, Jeffrey Jones testified for the defense. From his apartment window, Jones saw the fight begin. He exited his apartment and approached the skirmish. As he did, he heard Chambers yell "[h]e's got a knife." N.T. at 77. Jones explained that, "[a]t this time, the women are pepper-spraying the gentleman" and Chambers was telling him "to look for the knife. Find the knife." Id. Jones searched for a knife until the police arrived, but did not find one.
Even viewed in the light most favorable to the Commonwealth, Jones' testimony did not establish a conspiracy. At most, Jones' testimony established that, while the women were pepper spraying Wilson, Chambers exclaimed that Wilson had a knife and urged Jones to find that knife. Jones did not testify that Chambers' request to Jones to find the knife was some sort of call to arms. Nor can we infer that Chambers' request to Jones was an invitation to the pepper spraying woman to join the fight; indeed, Jones testified that the woman already was spraying the mace when Chambers shouted to Jones. Chambers' exclamation was directed at Jones, and it was a request to find the knife, not to join the fight.[8]
*414 As we held in Kennedy , "persons do not commit the offense of conspiracy when they join into an affray spontaneously, rather than pursuant to a common plan, agreement, or understanding." 453 A.2d at 930. Even in the light most favorable to the Commonwealth, the record demonstrates only that a fight broke out between Chambers and Wilson, and that those in the Jeep "spontaneously" came to Chambers' assistance, not pursuant to any unlawful pact.
The trial court found that, "[u]nder the circumstances of this case," a conspiratorial agreement existed between Chambers and the assisting group "by way of their relationship to each other." Tr. Ct. Op. at 22. The trial court did not expound upon the nature of this purported relationship aside from noting that a defense witness testified that one of the women was Chambers' girlfriend. Nor did the court explicate precisely how such relationship necessarily amounted to a criminal conspiracy. The trial court's analysis highlights the problems that can arise when a court assumes the existence of conspiratorial agreements based only upon perceived relationships between actors. The trial court effectively conjectured that, because an intimate relationship purportedly existed between Chambers and one of the women, a conspiracy necessarily existed as well. There is no evidence in the record to support such speculation. Proof of a criminal conspiracy-beyond a reasonable doubt no less-requires more than a trial court's belief that the alleged co-conspirators were dating one another.
The Superior Court also erroneously found sufficient evidence that a conspiracy existed between Chambers and the occupants of the Jeep. After outlining the legal precepts governing both accomplice liability and conspiracy, the Superior Court panel block-quoted from the trial court's opinion and "agree[d] with the trial court's analysis and conclude[d] that the court did not err in holding [Chambers] liable as both an accomplice and a conspirator." Chambers , 157 A.3d at 515. Because the trial court's analysis was deficient, the Superior Court's conspiracy holding reached in substantial reliance upon that court's discussion similarly was deficient. More importantly, however, the panel's ruling must be vacated because, as we explained above, the evidence at trial was insufficient to prove the existence of a conspiracy.
We also find the Superior Court's accomplice liability rationale to be flawed. The panel held that it "agree[d]" with the trial court's holding that Chambers was liable for the mace-spraying woman's actions as an accomplice. But the trial court made no such holding. The trial court's verdict was based upon conspiratorial liability alone, and in no way upon Chambers being an accomplice to the mace-wielding woman. Chambers was not charged as an accomplice, nor did the Commonwealth pursue a conviction upon accomplice liability at trial. In fact, during closing arguments, the prosecutor argued that Chambers attempted to cause serious bodily injury and should be found guilty of aggravated assault as a first-degree felony based upon his own actions.
Not only did the Commonwealth not pursue accomplice liability at trial, it did not do so before the Superior Court either. To the contrary, the Commonwealth conceded that the trial court found Chambers guilty only as a co-conspirator. See Super. Ct. Brief for the Commonwealth, No. 2389 EDA 2015, at 21 n.11. The notion of accomplice liability only was introduced into the case by Chambers in his Rule 1925(b) statement, presumably as a protective measure to avoid waiver when appealing from the trial court's less-than-clear verdict. The trial court did not explain that its *415 verdict was based upon conspiratorial liability until its Rule 1925(a) opinion. Thus, it was reasonable for Chambers to include accomplice liability in his Rule 1925(b) statement, if for no other reason than to ensure preservation of all potential defenses or issues. However, in point of fact, accomplice liability played no role in the Commonwealth's theory of the case, the closing arguments, the trial court's deliberation, or the actual verdicts here.
Putting the Superior Court's misapprehension of the trial proceedings aside, the factual record does not support accomplice liability. A person is an accomplice, and "equally criminally liable for the acts of another if he acts with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense." Spotz , 716 A.2d at 585-86 (citing Commonwealth v. Cox , 546 Pa. 515, 686 A.2d 1279, 1286 (1996) ). Here, for Chambers to have been an accomplice to the floral-shoed, mace-spraying woman, the Commonwealth would have had to prove that he agreed to aid, aided, or attempted to aid her in assaulting Wilson with the mace. We explained above why the record lacks evidence of such an agreement. There is a similar dearth of evidence demonstrating that Chambers aided or attempted to aid the woman. Chambers was in the midst of a fist-fight when the woman began to spray Wilson with the mace. There is no indication in the testimony that Chambers knew she was going to join the fight, knew she had mace, or knew she was going to use the mace. Additionally, Chambers did nothing to assist the woman in deploying the mace. At one point during the melee, Chambers held Wilson to the ground. But the testimonial record establishes only that Chambers did so for the purpose of continuing his own assault upon Wilson, not to facilitate the woman's aggravated assault. For many of the same reasons that the record is insufficient for conspiracy, it is insufficient to prove accomplice liability as well.
The Commonwealth did not prove beyond a reasonable doubt that Chambers was guilty of the substantive offense of criminal conspiracy. Without a conspiracy, the evidence similarly was insufficient to prove Chambers guilty, upon a theory of conspiratorial liability, of aggravated assault and of possessing instruments of crime. The Superior Court's order is reversed, and Chambers' judgment of sentence is vacated. Because our decision likely upsets the trial court's overall sentencing scheme, see generally Commonwealth v. Goldhammer , 512 Pa. 587, 517 A.2d 1280, 1283 (1986), the case is remanded to the trial court for resentencing on Chambers' remaining, unchallenged convictions for terroristic threats, simple assault, and recklessly endangering another person.
Justices Baer, Todd and Donohue join the opinion.
Chief Justice Saylor files a concurring opinion.
Justice Dougherty files a dissenting opinion in which Justice Mundy joins.

The trial testimony variously and interchangeably referred to "pepper spray" and "mace."

See, e.g., Commonwealth v. Montalvo , 598 Pa. 263, 956 A.2d 926, 932 (2008) (holding that each member of a conspiracy to commit murder can be convicted of first-degree murder, regardless of who actually killed the victim). The theory of conspiratorial liability took root in the substantive criminal law when the Supreme Court of the United States approved of the doctrine in Pinkerton v. United States , 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Accordingly, the principle sometimes is referred to as "Pinkerton liability." See United States v. Zackery , 494 F.3d 644, 648 (8th Cir. 2007) ; United States v. Fonseca-Caro , 114 F.3d 906, 908 (9th Cir. 1997).

Chambers also challenged the sufficiency of the evidence to prove that mace met the definition for a deadly weapon, and averred that his due process rights were violated when he was convicted of possessing instruments of crime, with mace being the deadly weapon, when the criminal information stated that a knife was the basis for that charge. Chambers does not pursue those issues in the instant appeal, and we will not address them. As well, before us, Chambers has not challenged his convictions for terroristic threats, simple assault, and recklessly endangering another person.

Section 306 provides as follows:
(a) General rule.- A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.
(b) Conduct of another.- A person is legally accountable for the conduct of another person when:
(1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;
(2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or
(3) he is an accomplice of such other person in the commission of the offense.
(c) Accomplice defined.- A person is an accomplice of another person in the commission of an offense if:
(1) with the intent of promoting or facilitating the commission of the offense, he:
(i) solicits such other person to commit it; or
(ii) aids or agrees or attempts to aid such other person in planning or committing it; or
(2) his conduct is expressly declared by law to establish his complicity.
(d) Culpability of accomplice.- When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.
18 Pa.C.S. § 306.

The Superior Court of Pennsylvania also routinely applies the concept of conspiratorial liability. See Commonwealth v. Mitchell , 135 A.3d 1097, 1102-03 (Pa. Super. 2016) ; Commonwealth v. Vargas , 108 A.3d 858, 874 (Pa. Super. 2014) ; Commonwealth v. Lambert , 795 A.2d 1010, 1016-17 (Pa. Super. 2002) (en banc ); Commonwealth v. Stocker , 424 Pa.Super. 189, 622 A.2d 333, 341 (1993).

Compare Commonwealth v. Knox , 629 Pa. 467, 105 A.3d 1194, 1198-99 (2014) (Eakin, J., concurring) (suggesting in a concurring opinion that "conspiracy is a distinct crime-it is not a statutory theory of liability for criminal acts of other people. If one conspires to commit a crime, one is guilty of conspiracy, but not the crime conspired."); and Commonwealth v. Muhammad , 1300 EDA 2014, 2015 WL 7300099, slip op. at *3 (Pa. Super. Apr. 20, 2015) (unpublished memorandum) (holding that the General Assembly abolished the common law "conspiracy liability" rule when it adopted the Model Penal Code approach to accomplice liability); with Commonwealth v. Johnson , 611 Pa. 381, 26 A.3d 1078, 1096 (2011) (McCaffery, J., dissenting) ("[N]o principle of law is more firmly established than that when two or more persons conspire or combine with one another[ ] to commit an unlawful act, each is criminally responsible for the acts of his associate or confederate committed in furtherance of the common design."); and Commonwealth v. Saunders , 946 A.2d 776, 781 (Pa. Super. 2008) ("[T]he law in Pennsylvania is settled that each conspirator is criminally responsible for the actions of his co-conspirator, provided that the actions are accomplished in furtherance of the common design.").

On this point, the learned Dissent maintains that we construe the facts in Chambers' favor, contrary to our standard of review, and that the trial evidence in fact supports the opposite conclusion, i.e. , that Chambers actually held Wilson so that the woman could spray him with mace. See Dissenting Opinion ("D.O.") at 417. We respectfully disagree.
Although our standard of review requires us to view the evidence in the light most favorable to the Commonwealth as verdict winner, we are required as well to consider and evaluate the entire record, including those facts at trial that do not fall in the Commonwealth's favor. Commonwealth v. Sanchez , 623 Pa. 253, 82 A.3d 943, 967 (2013) ("In reviewing whether the evidence was sufficient to support a [ ] conviction or convictions, the entire trial record must be evaluated and all evidence considered.") (citation omitted). The trial testimony was unequivocal and consistent that Chambers got on top of Wilson, held him down, and resumed striking him repeatedly in the midsection. We draw no inferences in Chambers' favor. We merely recite the clear and consistent testimony of all of the trial witnesses. Further, we observe that no one testified to the contrary. Although we must draw reasonable inferences in the Commonwealth's favor, no inference can be drawn from the facts without at least some evidentiary support for that inference.

In opining that sufficient evidence of a conspiracy was presented, the Dissent invokes what it labels "salient evidence of communications between [Chambers] and his companions." D.O. at 418. In fact, the Dissent focuses upon the communications between Chambers and Jones, as testified to by Jones at trial, and upon the purported impact that those communications had on the women that intervened. As we explained above, Jones' testimony established, at most, only that Chambers urged him to find a knife. We respectfully disagree with the Dissent's suggestion that Jones' testimony reasonably could support the inference that the women began spraying the mace "after" Chambers yelled about a knife. D.O. at 418. In his testimony, Jones described the ongoing actions in the present tense. Jones unequivocally testified that, when Chambers called out about a knife, the women already were spraying (or trying to spray) Wilson with the mace. See N.T. at 76-77.
The Dissent would conclude that Chambers' exclamation that "Yo, he's got a knife" was in fact some veiled communication to the women, one that actually prompted them to action or "at least encouraged their continued involvement." D.O. at 418. This conclusion is not a record-based reasonable inference. Jones clearly articulated that the women already were involved in the attack (without invitation by Chambers) by the time Chambers yelled to Jones. The women did not modify their behavior or take any additional actions thereafter. There is no support for an inference that Chambers' exclamation was a call to arms urging others to act in concert and forming a conspiracy. Nor does the fact that Chambers yelled to Jones contradict our conclusion that Chambers never urged others to participate in the assault on Wilson, as the Dissent maintains. Id. at 418. Again, the women already were participating at the point that Chambers called out to Jones. Chambers' statement could not be an invitation to the women to begin doing what they already were doing..