**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHRISTIAN RAYMOND BORGES-QUINONES | : | |
| | : | No. 1179 MDA 2020 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered August 11, 2020
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003940-2019

BEFORE: MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.: **FILED: JUNE 3, 2021**

Christian Raymond Borges-Quinones (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of criminal conspiracy to commit simple assault. *See* 18 Pa.C.S.A. §§ 903, 2701(a)(1). We affirm.

On July 14, 2019, Terrell Nelson (the victim) and his paramour, Kiara Borges (Borges),[1] drove to the residence of Borges' mother, Elba Alequin (Alequin), to do laundry. N.T., 6/23/20, at 74, 95. Borges and the victim parked their car and waited for Alequin to return to the house. *Id.* at 75, 113. Appellant's brother and co-conspirator, Felix Alvarez-Quinones (Felix), resided

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Borges is Appellant's sister. N.T., 6/23/20, at 74, 95.

at the house and was home when the victim and Borges arrived. *Id.* at 75, 77, 112.

The victim and Borges, while waiting for Alequin, saw Appellant walking in and out of the house, which was unusual because Alequin had prohibited Appellant from entering the house. *Id.* at 75, 96, 112, 151. The victim saw Felix speaking with Appellant outside. *Id.* at 76. Alequin eventually returned, and Borges and the victim helped Alequin carry groceries into the house. *Id.* at 76, 113.

The victim encountered Felix in the house. *Id.* at 77, 98, 113. There was tension between Felix and the victim, as they had argued the previous day. *Id.* at 75, 77, 82-83, 98. Alequin told Felix and the victim not to continue the argument in the house, and they initially complied. *Id.* at 77, 98.

Appellant walked to the front door of the house and stood on the steps. *Id.* at 77, 98, 114-15, 118. Alequin and Borges went to the door to meet Appellant, who began yelling insults at Alequin and arguing with Borges. *Id.* at 77, 98, 114-15, 118. The victim was in the kitchen at the time, making a telephone call. *Id.* at 77-78, 88.

Felix heard the commotion from upstairs and came down to see what was going on. *Id.* at 77, 100, 116-18. Alequin asked Felix to help prevent Appellant from entering the house. *Id.* at 116, 118. Felix told Alequin "No." *Id.* Alequin and Borges tried to bar the door, but Felix and Appellant, acting together, pushed the front door open for Appellant to gain entry. *Id.* at 77,

100, 116-18. Once inside, Felix and Appellant ran to the kitchen to confront the victim. *Id.* at 77-78, 100, 118. The victim testified that Felix initially punched him in the face and ribs, after which Appellant struck the victim. *Id.* at 78. Both Felix and Appellant punched the victim multiple times. *Id.* at 78, 100-01, 118.

During the fracas, Alequin announced she was going to call the police. *Id.* at 79, 102-03, 121. Appellant and Felix then ran out of the house and left in Appellant's car. *Id.* at 79, 103. The next day, the victim went to the hospital where he was treated for a fractured bone in his face and a swollen eye. *Id.* at 81-82.

In October 2019, the Commonwealth charged Appellant with two counts of simple assault, one count of conspiracy to commit simple assault, and three counts of harassment. *See* 18 Pa.C.S.A. §§ 2701(a)(1), 903, 2709(a). On June 22, 2020, Appellant filed a pretrial motion *in limine*. In relevant part, Appellant sought permission to cross-examine the victim about his status as a probationer at the time of the assault, and whether his probation status caused him to lie about not being the aggressor.

Before the start of trial on June 23, 2020, the court heard argument on the motion *in limine*. Thereafter, court permitted Appellant to question the victim about being on probation at the time of the assault. The court also allowed the defense to state that the victim could potentially face "adverse consequences" for a probation violation or new arrest. However, the court

precluded the defense, over its objection, from stating the victim could face jail time if he violated his probation. The trial court stated to defense counsel:

> You're going to get your ability to argue that there was some adverse consequence if [the victim] was under supervision; that if that would have occurred, . . . a new arrest would be an adverse consequence to being under supervision. Okay. But none of us know whether or not he would have definitively gone to jail.

N.T., 6/23/20, at 12.

The matter proceeded to trial. A jury tried Appellant on the simple assault and conspiracy to commit simple assault charges, and the trial court simultaneously tried Appellant on three counts of summary harassment.

The Commonwealth presented testimony from the victim, Borges, Alequin, and the investigating police officer. Appellant testified and claimed the victim was the aggressor. *See id.* at 154-55 (Appellant stating, "When I ran inside and got to the kitchen, . . . I see [the victim] punch Felix in the face. . . . [S]o I got in, tried [] to separate the fight the best way I could."). Appellant denied ever striking the victim. *Id.* at 155.

The jury found Appellant guilty of criminal conspiracy and acquitted him of one count of simple assault. The trial court granted judgment of acquittal on the remaining simple assault count and found Appellant not guilty of all harassment charges.

Appellant did not file post-sentence motions. Appellant timely filed a notice of appeal. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises two issues for our consideration:

A. Whether the trial court erred in denying Appellant's Motion *in Limine* seeking to introduce at trial that jail time was a potential adverse consequence to a violation of probation and, therefore, a possible motivator for the alleged victim's version of the alleged events?

B. Whether there was sufficient evidence to sustain the conviction on the charge of Criminal Conspiracy to Commit Simple Assault where the Commonwealth failed to present any evidence that there was an agreement with any other person or persons to commit Simple Assault?

Appellant's Brief at 5.

Appellant first challenges the trial court's order denying his motion *in limine*. We review such orders for an abuse of discretion. ***Commonwealth v. Mangel***, 181 A.3d 1154, 1158 (Pa. Super. 2018).

It is settled that the admission of evidence,

is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

***Commonwealth v. Cosby***, 224 A.3d 372, 397 (Pa. Super. 2019) (citation omitted).

Appellant argues the trial court erred in precluding the defense from suggesting the victim could face jail time if he violated his probation. ***See*** Appellant's Brief at 11-14. Appellant maintains:

The inability of defense counsel to inquire into the potential penalty [the victim] faced if found to be in violation of his probation was a critical factor that likely would have swayed the jury to disbelieve the rest of [the victim's] weak and

uncorroborated testimony. [The victim's] testimony against [Appellant] could have been impeached with the fact that he faced jail time if [he] was found to be in violation of his probation and this potential outcome motivated his lies.

*Id.* at 14.

It is well-settled that,

a criminal defendant has a right to cross-examine any adverse witness . . . for the purpose of impeaching his credibility. The credibility of a witness may be impeached by evidence which tends to show that the witness had an interest in the outcome of the trial, or that the witness' testimony may be untruthful, or that the witness may possess a bias which colors his testimony[.]

*Commonwealth v. Butler*, 601 A.2d 268, 271 (Pa. 1991) (internal citations omitted).

Further, the Pennsylvania Supreme Court has explained:

[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

*Commonwealth v. Patterson*, 91 A.3d 55, 69 (Pa. 2014) (citation omitted); *see also Commonwealth v. Lane*, 621 A.2d 566, 568 (Pa. 1993) ("It is particularly important that, where the determination of a defendant's guilt or innocence is dependent upon the credibility of a prosecution witness, an adequate opportunity be afforded to demonstrate through cross-examination that the witness is biased." (citation omitted)).

Finally, the scope of cross-examination is within the discretion of the trial court and will not be reversed absent an abuse of discretion. ***Commonwealth v. Chmiel***, 889 A.2d 501, 527 (Pa. 2005).

Here, the trial court, consistent with ***Patterson***, *supra* and ***Butler***, *supra*, permitted the defense to question the victim about being a probationer who could face adverse consequences if he violated probation. ***See*** N.T., 6/23/20, at 89-90. Indeed, the court gave the defense latitude to question the victim about whether being on probation influenced him to falsely deny being the aggressor. ***See, e.g., id.*** at 89 (defense counsel inquiring: "And if a different party is the first to talk to police and tells a story where you're the aggressor, it's possible that your probation would be violated, correct?"); ***id.*** (defense counsel asking the victim: "do you know if you change your story after having given a report to police you can be charged with a new crime, false reports, right?"). Further, our review confirms the trial court's finding that there was no evidence suggesting the victim would have faced jail time for a hypothetical probation violation. ***See*** N.T., 6/23/20, at 10; ***see also*** Trial Court Opinion, 12/3/20, at 3.

In sum, we discern no abuse of the trial court's discretion and agree with its conclusion:

> The defense did not need to **specifically mention** that [the victim] could have been sent to jail for violating his probation to show the jury that [the victim] may have had a motive to lie. The fact that [the victim] was on probation and could have faced adverse consequences if he were to violate his probation was enough for the defense to show motive or bias.

- 7 -

Trial Court Opinion, 12/3/20, at 4 (emphasis added); *accord Lane*, 621 A.2d at 568 (rejecting defendant's challenge to trial court's limitation of defense cross-examination of prosecution witness and stating: "It is quite clear that the court in this case permitted sufficient latitude on cross-examination to inform the jury that the witness, faced with multiple outstanding felony charges in the same jurisdiction, might be biased against appellant in order to obtain favorable treatment in his own prosecution."). Appellant's first issue lacks merit.[2]

Appellant next argues the Commonwealth failed to present sufficient evidence to prove all elements of the crime of conspiracy to commit simple assault beyond a reasonable doubt. *See* Appellant's Brief at 15-19.

The standard we apply when reviewing the sufficiency of the evidence is whether,

> viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In

---

[2] Even if the trial court erred in limiting cross-examination of the victim, no relief is due because the defense suffered no discernable harm by the trial court's ruling. *See, e.g., Commonwealth v. Schley*, 136 A.3d 511, 515 (Pa. Super. 2016) (to constitute reversible error, an evidentiary ruling must not only be erroneous but also harmful or prejudicial to the complaining party); *Commonwealth v. Rivera*, 2021 PA Super 53, *12 (Pa. Super. 2021) (discussing harmless error doctrine and explaining a defendant is entitled to a fair trial but not a perfect one). Indeed, the trial court only precluded the defense from **explicitly** mentioning jail as a possible adverse consequence the victim could face for a probation violation.

addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated, and all evidence actually received must be considered. Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Smith***, 206 A.3d 551, 557 (Pa. Super. 2019) (citations and brackets omitted). "On appeal, this court evaluates the full record to determine whether sufficien[t] evidence was presented to support each element of the crime charged; however, we do not second-guess the jury's factual determinations." ***Commonwealth v. Risoldi***, 238 A.3d 434, 454 (Pa. Super. 2020).

Appellant argues his conspiracy conviction cannot stand because the Commonwealth presented no evidence Appellant entered into an agreement with Felix to commit simple assault. ***See*** Appellant's Brief at 16-17; ***see also id.*** at 16 (arguing any agreement was "mere conjecture").

We are guided by the following principles:

To convict a defendant of conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant **entered into an agreement with another** (a "co-conspirator") to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. 18 Pa.C.S.A. § 903. The essence of a criminal

conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators.

Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime. There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator. Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators. Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.

*Commonwealth v. Dunkins*, 229 A.3d 622, 633 (Pa. Super. 2020)

(emphasis added, some citations omitted).

Further, our Supreme Court has cautioned:

A conspiracy cannot be established based only upon mere suspicion and conjecture. Preexisting relationships or **mere association** of participants, without more, will not suffice to establish a prosecutable criminal conspiracy. . . . In other words, even a husband and a wife, a parent and a child, friends, paramours, or siblings are not, by virtue of these close relationships alone, conspirators when acting in concert. The Commonwealth still must demonstrate the formation of an illicit agreement, the attendant specific shared intent to promote or facilitate the object offense, and an overt act. No level of intimacy or history between actors can replace the elements of the offense.

*Commonwealth v. Chambers*, 188 A.3d 400, 410 (Pa. 2018) (emphasis in

original, citations and quotation marks omitted). Our Supreme Court in

*Chambers* further explained:

- 10 -

[D]irect evidence of the formation of a conspiratorial agreement is rare, and often must be derived from the facts and circumstances of each case. **The agreement need not be formal, nor must it even be expressly communicated. It can be established instantaneously**, or it can be the product of drawn-out deliberations. By way of example, in the context of multi-person fights, two participants can form a conspiracy to assault another person by discussing at length a plan to assault that person, or, alternatively, those same individuals can form the illicit agreement by mere nodding of heads, so long as they possess the requisite intent.

*Id.* at 411 (emphasis added).

Appellant argues "neither the familial relationship between [Appellant] and his co-defendant/brother Felix nor [Appellant's] presence at the scene of the assault is sufficient to establish the existence of a conspiracy." Appellant's Brief at 15 (citing *Chambers*, *supra*). Appellant contends, "There exists no testimony, contrary to the court's assertion, that Felix and [Appellant] acted in harmony in pushing the door open with the express purpose of entering the house to assault [the victim]." *Id.* at 16-17. Appellant relies on *Commonwealth v. Kennedy*, 453 A.2d 927, 930 (Pa. 1982), in which our Supreme Court stated that merely jumping into an "affray spontaneously, rather than pursuant to a common plan, agreement, or understanding" does not constitute criminal conspiracy. *See* Appellant's Brief at 18.

Our review of the record reflects that Appellant entered the house despite Alequin barring him from do so. N.T., 6/23/20, at 96, 112. On the previous day, Appellant's brother, Felix, got into an argument with the victim. *Id.* at 75, 82-83, 98. Borges stated that when she and the victim arrived at

the house and saw Appellant, she was concerned because she knew Appellant was not permitted there. *Id.* at 96. Appellant argued with Borges at the front door to the house and yelled insults at Alequin. *Id.* at 77, 98, 114-15, 118. In addition, the victim saw Appellant and Felix talking just prior to the assault. *Id.* at 76.

Felix, upon hearing the commotion, had come downstairs. *Id.* at 77, 100, 116-18. Alequin asked Felix to help prevent Appellant from entering the house; Felix refused. *Id.* at 116, 118. Borges explained what happened next:

Q. [The prosecutor:] Did [Appellant] try to come in the house?

A. He did.

Q. And did anyone try to stop him from coming in the house?

A. I was standing in the [] door telling him to go and that's when he started yelling loud and me and [Alequin] were standing there and that's when Felix came down and went into the middle hallway as well.

Q. What happened there?

A. Felix came down. He was confused. And then [**Appellant**] **and** [**Felix**] **ended up pushing through and they ran to the kitchen** and that's when they started to hit [the victim] in the kitchen.

Q. Did you go into the kitchen?

A. Yes, I did.

* * *

Q. What did you see?

A. I saw [Appellant] hitting [the victim] with Felix, Felix slapping [the victim] on his lap [and] his face, and [Appellant] just kept hitting him and hitting him. We went into the kitchen to try to

- 12 -

break them apart; and when we tried, [Appellant] ended up pushing [Alequin] into the cabinets in the kitchen[.]

*Id.* at 100-01 (emphasis added); *see also id.* at 102 (Borges stating Appellant was the aggressor and hit the victim four times).

The prosecutor also questioned Alequin about the melee:

Q.   After [Appellant's verbal] argument with [Borges,] what happened?

A.   Felix came down.  He was confused because he didn't know what was happening at that very moment. . . . And I told [Felix] to help me with [Appellant], to not let [Appellant] come inside. [**Felix**] **looked at me and he said**, **No**, and [Appellant] went up the steps.   And **between both** [**Appellant and Felix**], **they pushed the door** and that's when [Appellant] came in with Felix. . . . So between both of them, they hit [the victim].

*Id.* at 116 (paragraph breaks omitted); *see also id.* at 118 (stating "Felix [] was the first one to run towards the kitchen; and he . . . gave the first punch. So when [Appellant] came, he also was punching [the victim] all over the place.").  When Borges called the police, Appellant and Felix fled together in Appellant's car.  *Id.* at 103.

The above evidence, viewed in a light most favorable to the Commonwealth as the verdict winner, was sufficient to establish the agreement element of criminal conspiracy.  It was not necessary for Appellant and Felix to expressly communicate their agreement or formulate a detailed plan.  *See Chambers*, *supra*.  The concert of action of Appellant and Felix circumstantially established their agreement.  *See Dunkins*, *supra* ("the agreement is almost always proven through circumstantial evidence, such as

- 13 -

by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators."). Felix refused Alequin's request to keep Appellant out of the house, and both Felix and Appellant jointly forced the front door open and ran into the kitchen to attack the victim. ***See*** N.T., 6/23/20, at 96, 116, 118.

To the extent there were conflicts in the testimony, it was within the sole purview of the jury to evaluate credibility and determine the weight to be given the conflicting testimony, which we may not re-weigh on appeal. ***See Commonwealth v. Reynolds***, 835 A.2d 720, 726 (Pa. Super. 2003) ("It is the function of the jury to evaluate evidence adduced at trial to reach a determination as to the facts, and where the verdict is based on substantial, if conflicting evidence, it is conclusive on appeal." (citation omitted)). The jury ostensibly credited the testimony of the Commonwealth's witnesses and discredited Appellant's self-serving account; we may not disturb this finding. ***See id.***

Finally, the authority upon which Appellant relies is distinguishable and unavailing. ***See Kennedy***, 453 A.2d at 930 (holding no conspiracy existed where defendant and his alleged co-conspirator "acted independently and spontaneously" in beating the victim, and emphasizing "[t]he fact that the affray erupted from an argument, the manner in which the beating was inflicted, and the overt acts of the participants prior to and concurrent with

commission of the assault fail to bespeak concert of action indicative of a common design.").  Accordingly, Appellant's sufficiency challenge fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/03/2021