J-S64023-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMIL BANKS | : | |
| | : | |
| Appellant | : | No. 3579 EDA 2017 |

Appeal from the PCRA Order October 5, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0009614-2012

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 08, 2019**

Appellant, Jamil Banks, appeals from the order entered on October 5, 2017, dismissing his first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

We previously summarized the facts of this case as follows:

On April 12, 2008, at about 12:30 p.m., Joan Hill was working at an insurance office located at 5637 Chew Avenue when she saw a blue Lincoln town car park with the engine running on Woodlawn Avenue. A man, [dressed in women's Muslim clothing and] later identified as [co-]defendant [Qentin] Salmond,[1] [] exited the vehicle. Hill believed the man was going to rob Skyline Restaurant, located around the corner, so she called 9-1-1 and gave the license plate number of the vehicle.

At around noon that day, Kerron Denmark and Kenneth Wiggins went to Skyline Restaurant and Wiggins ordered food. Immediately after they left the restaurant with Wiggins carrying

---

[1]  Qentin Salmond currently has an appeal with this same panel at 722 EDA 2018.

his food, a man approached them asking for marijuana. As Denmark and Wiggins were walking down the street someone yelled "don't f'ing move." Denmark heard gunshots and ran away.

On April 12, 2008, at 12:44 p.m., while on routine patrol, Police Officer Christopher Mulderrig was flagged down by a man on the street and told there had been a shooting about two blocks away. When Officer Mulderrig arrived at 5643 Chew Avenue, he observed a male, later identified as Wiggins, lying in the street with a gunshot wound to the chest. Wiggins subsequently died from this gunshot to his chest.

After the murder, Detective Thorsten Lucke recovered surveillance video from Skyline Restaurant. The surveillance video showed Wiggins and Kerron Denmark enter Skyline Restaurant. While the men are inside the restaurant, a vehicle drives by on Chew Avenue and turns left at the corner. [Appellant] and [co-]defendant Salmond, wearing women's Muslim clothing, emerge from the area where the car had turned from Chew Avenue. The [co-]defendants walk towards Skyline Restaurant. [Co-d]efendant Salmond stops in an alley while [Appellant] enters the restaurant. [Appellant] buys a bottle of soda, leaves the restaurant, and stands with [co-]defendant Salmond in the alley, out of sight of the camera. After Wiggins gets his food, he and Denmark leave the restaurant and walk down the street. [Appellant] follows closely behind Wiggins and Denmark while [co-]defendant Salmond follows farther back. [The co-]defendants confront Wiggins and Denmark and Wiggins falls to the ground. Quickly thereafter everyone runs away.

Police Officer Joanne Gain of the Crime Scene Unit recovered two .22 caliber fired cartridge casings, a Nike Air Jordan sneaker, and a Mountain Dew bottle from the murder scene. Officer Gain tested the Mountain Dew bottle for fingerprints and DNA. According to Police Officer John Cannon, an expert in firearms identification, these two .22 caliber fired cartridge casings were fired from the same unrecovered firearm. The bullet recovered from the decedent's body and the [recovered .22 caliber] cartridge casings were not fired from the same firearm.

On April 14, 2008, at about 9:00 p.m., an unlicensed blue Lincoln town car was found on fire in the area of Tenth Street and Chew Avenue. Lieutenant Rodney Wright of the Philadelphia Fire Department determined that the vehicle was burned intentionally.

On April 15, 2008, Charles Hayward gave a statement to police. Hayward explained that in February he had sold the blue Lincoln town car that Hill had called in to 9-1-1 to Bernard Salmond, [co-]defendant Salmond's brother. According to Hayward, about a week previously, Wiggins had robbed [co-]defendant Salmond after they had been gambling.

On April 17, 2008, Richard Hack, a friend of Wiggins, gave a statement to police. Hack explained that two days before the murder, [co-]defendant Salmond, Wiggins, and himself were gambling. [Co-d]efendant Salmond and Wiggins argued about a gambling debt and then Wiggins choked [co-]defendant Salmond and took $1000[.00] from him. For the next couple of nights, [co-]defendant Salmond and his friends were in the area looking for Wiggins.

On January 13, 2010, Robert Bluefort told police that about three weeks after the murder, [co-]defendant Salmond confessed to him that he shot Wiggins. According to [co-]defendant Salmond[,] he had to shoot or be shot. Bernard Salmond told Bluefort that the police had questioned Hayward because the car that was used in the murder was in his name. Bluefort and Bernard Salmond then discussed burning the vehicle. Bernard Salmond stayed with Bluefort for about a month after the murder.

[…T]he jury found Appellant guilty of [third-degree murder, conspiracy to commit murder, possession of an instrument of crime (PIC), and carrying an unlicensed firearm[2]] arising from the shooting death of Mr. Wiggins. On July 28, 2014, the court imposed sentence. Specifically, it sentenced Appellant to twenty to forty years imprisonment for third-degree murder, followed by two consecutive terms of incarceration of five to ten years for conspiracy and persons not to possess a firearm. In addition, the court imposed concurrent sentences of three and one-half to seven years imprisonment for carrying an unlicensed firearm, and one to two years for PIC.

**Commonwealth v. Banks**, 2015 WL 7187621, at *1-2 (Pa. Super. 2015)

(unpublished memorandum).

---

[2]  18 Pa.C.S.A. §§ 2502(c), 903, 907, and 6106, respectively.

We affirmed Appellant's judgment of sentence in an unpublished memorandum on November 16, 2015. Our Supreme Court denied further review on May 24, 2016. *See Commonwealth v. Banks*, 636 Pa. 637 (Pa. 2016). Appellant filed a timely PCRA petition on September 12, 2016. The PCRA court appointed PCRA counsel. Appointed counsel filed an amended PCRA petition on May 10, 2017. On August 31, 2017, the PCRA court filed a notice of intent to dismiss the amended PCRA petition without an evidentiary hearing pursuant to Pa.R.CrimP. 907. Appellant did not respond. On October 5, 2017, the PCRA court entered an order, and an accompanying opinion pursuant to Pa.R.A.P. 1925(a), denying Appellant relief. Appellant filed a timely notice of appeal on November 2, 2017. The trial court relied upon its earlier opinion as its rationale for denying relief.

On appeal, Appellant presents the following issues for our review:[3]

1.  Was trial counsel ineffective for having failed to have [Appellant] tested for DNA results?

2.  Was appellate counsel ineffective for having failed to raise and brief the issues of the weight and sufficiency of the evidence and to the extent that trial counsel failed to file a necessary [p]ost [s]entence [m]otion regarding the weight of the evidence[,] was trial counsel ineffective for having failed to do that?

Appellant's Brief at 8.

---

[3] Despite presenting a sole issue in the statement of questions presented section of his appellate brief, Appellant raises two discrete ineffective assistance of counsel issues in the argument section of his brief. He raised these issues in his amended PCRA petition and the PCRA court addressed them in its Rule 1925(a) opinion. We will address the two issues separately.

In his first appellate issue, Appellant presents two legally distinct, but overarching claims pertaining to DNA testing. Appellant claims that: (1) the PCRA court erred by refusing to order DNA testing; and (2) trial counsel was ineffective for failing to secure and submit Appellant's DNA sample to compare with the DNA results taken from a soda bottle recovered from the scene. *Id.* at 8-10. More specifically, on appeal Appellant posits, in sum:

> The defense, at trial, focused on the lack of DNA evidence matching up to [Appellant]. However, the DNA expert did not have [Appellant's] sample submitted to him, not by the Commonwealth nor the defense. Trial counsel was ineffective. If trial counsel was going to make a central point of the defense the DNA evidence, then [trial] counsel had to make sure that the DNA was tested. [PCRA counsel] has presumed that the DNA would not have matched; otherwise, why would [trial] counsel [not] have pursued it? Moreover, the failure to get the DNA tested only left the air at trial tainted with the smell of the defense hiding something. In any event, if [trial counsel] was going to rely on DNA testing to help acquit [Appellant], then the predicate to such argument was to have the DNA test. It's just common sense. It is also ineffective assistance of counsel for having failed to do so. [PCRA counsel] recognize[s] that the [c]ourt cannot grant a new trial on this alone; however, counsel respectfully requested that the Honorable PCRA [c]ourt order that DNA be tested and, if the DNA would have supported an argument that [Appellant] was not culpable in this case, then, a new trial would have been requested. Now, [PCRA counsel] asserts that the PCRA [c]ourt erred and that this Honorable Court should right that wrong by either reversing the PCRA [c]ourt for a full evidentiary hearing or by granting [] Appellant a new trial at this time.

*Id.* at 9-10 (record citation omitted).

Our standard of review is well-settled:

> This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal

error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.

***Commonwealth v. Durrett King***, 2018 WL 4102591, at *2 (Pa. Super. August 29, 2018) (internal citations, quotations, and brackets omitted).

We first examine Appellant's request for DNA testing before the PCRA court. Requests for post-conviction DNA testing are governed by 42 Pa.C.S.A. § 9543.1. An applicant must present "a *prima facie* case demonstrating that: (i) the identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and (ii) DNA testing of the specific evidence, assuming exculpatory results, would establish [] the applicant's actual innocence of the offense for which the applicant was convicted." 42 Pa.C.S.A. § 9543.1(c)(3). "The court shall not order the [requested DNA] testing [] if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that [] would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]" 42 Pa.C.S.A. 9543.1(d)(2).

"Post-conviction DNA testing falls under the aegis of the [PCRA] and thus, our standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error." ***Commonwealth v. Conway***, 14 A.3d 101, 108 (Pa. Super. 2011) (internal citations, quotations, and brackets omitted). "Moreover, because the resolution of this appeal involves statutory

construction, which involves a pure question of law, we review that aspect of the trial court's decision *de novo* and our scope of review is plenary." **Id.**

We have previously determined that there is no error where the PCRA court refuses to order DNA testing if the petitioner does not make a threshold showing:

> Significantly, in DNA testing cases, "an absence of evidence is not evidence of absence." **Commonwealth v. Heilman**, 867 A.2d 542, 547 (Pa. Super. 2005). **See also** [**Commonwealth v.**] **B. Williams**, [35 A.3d 44 (Pa. Super. 2011)] (affirming trial court's denial of DNA testing where appellant failed to meet threshold requirements for DNA testing, under Section 9543.1(a)(2), and did not demonstrate *prima facie* case of "actual innocence"; even if appellant's DNA were not found on hat/wig, record contained overwhelming evidence of appellant's guilt including three unshakable eyewitnesses, appellant's confession, and appellant's access to weapon used in crimes); **Commonwealth v. Smith**, 889 A.2d 582 (Pa. Super. 2005), *appeal denied*, 905 A.2d 500 (Pa. 2006) (affirming denial of request for post-conviction DNA testing where absence of appellant's DNA from victim's fingernails would not establish appellant's innocence of victim's murder; nothing in record supported appellant's claim that victim would have scratched her assailant leaving DNA evidence under her fingernails).

**Commonwealth v. Walsh**, 125 A.3d 1248, 1255 (Pa. Super. 2015).

Here, the trial court determined:

> [Appellant] requests that [the trial court] order DNA testing. This is not necessary. Even if the DNA testing excluded [Appellant], [Appellant] cannot escape the fact that the soda bottle at the crime scene contained his fingerprints.

PCRA Court Opinion, 10/5/2017, at 6 (citations omitted).

We discern no abuse of discretion or error of law by the PCRA court in denying Appellant's request for DNA testing. Here, there was eyewitness

- 7 -

testimony, from a police officer familiar with Appellant, that Appellant was the person wearing dark clothing seen on video surveillance purchasing a soda from the Skyline Restaurant, standing in the alley with his co-defendant, and confronting the victim just prior to the murder. *See* N.T., 3/7/2014, at 10-13. Fingerprint analysis of the bottle retrieved from a garbage can near the crime scene further tied Appellant to the crimes. *See* N.T., 3/6/2014, at 114-123; N.T., 3/7/2014, at 38 and 52. Because Appellant's fingerprints were discovered, there was no reasonable possibility that DNA testing would produce exculpatory evidence that would establish Appellant's actual innocence. Hence, the PCRA court did not err in failing to order DNA testing under Section 9543.1.

Next, Appellant suggests that trial counsel was ineffective for failing to submit his sample for DNA testing. In order to prove an ineffective assistance of counsel claim under the PCRA,

> we begin with the presumption that counsel rendered effective assistance. To overcome that presumption, the petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. If the petitioner fails to prove any of these prongs, the claim is subject to dismissal.
>
> Relating to the reasonable basis prong, generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. Courts should not deem counsel's strategy or tactic unreasonable unless it can be concluded that an alternative not

chosen offered a potential for success substantially greater than the course actually pursued.

To demonstrate prejudice in an ineffective assistance of counsel claim, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

***Durrett King***, 2018 WL 4102591, at *2.

In the PCRA context, our Supreme Court has stated the following regarding DNA analysis and trial counsel effectiveness:

It is easy to say that failing to pursue exculpatory evidence is ineffectiveness, but this presumes the evidence will indeed be exculpatory. If counsel were sure the accused's DNA would not be revealed in any relevant samples from the victim or scene, certainly testing would give exculpatory results and should be sought. However, the client's mere claim of innocence or alibi does not always settle the question; effectiveness of counsel is not dependent on accepting the candor of the client. Testing that shows the DNA matches suddenly makes a conviction-one that might have been avoided or less than certain-a sure thing.

That is, subjecting a client to DNA testing is very likely to settle whether there will be a conviction or not. It can demolish the prosecution's case, but it can cast it in concrete as well. It can eliminate the potential of a "not guilty" verdict based on an alibi, or on reasonable doubt, and the less compelling the Commonwealth's case, the less compelling is the desire for pre-trial DNA testing. Not seeking testing that has the potential to convict a client may be a very reasonable strategy; strategy is not measured through hindsight against alternatives not pursued, so long as trial counsel had a reasonable basis for the decision made.

***Commonwealth v. Williams***, 899 A.2d 1060, 1064 (Pa. 2006) (internal citations omitted).

On the allegation of ineffective assistance of counsel pertaining to DNA testing, the PCRA court determined:

- 9 -

This claim is without merit as trial counsel had a reasonable basis for not submitting [Appellant's] DNA to compare with the DNA found on the soda bottle. [Appellant's] fingerprints were on the bottle. [] DNA testing is not warranted when there is no reasonable possibility that the test would establish actual innocence.

[Appellant] also fails to show prejudice by offering any evidence or expert testimony that the DNA testing would have been exculpatory; instead, he merely speculates. Without this evidence, [Appellant] cannot show that if [Appellant] had submitted a DNA sample for testing, there was a reasonable probability that the outcome of trial would have been different.

PCRA Court Opinion, 10/5/2017, at 5-6 (citations omitted).

We agree with the PCRA court's analysis. Trial counsel had a reasonable basis not to submit Appellant's DNA sample for analysis. If the DNA test showed that Appellant was a match, the Commonwealth would have had additional evidence to support its case at trial. However, if the DNA test excluded Appellant, the Commonwealth still had evidence that Appellant's fingerprints were on the soda bottle, linking him to the crime. This is simply not a case where the evidence at trial solely hinged on DNA evidence, or lack thereof. The absence of Appellant's DNA in or on the soda bottle would not establish Appellant's actual innocence when faced with the additional evidence presented at trial. As such, trial counsel had a reasonable basis to decline submitting a sample from Appellant for DNA testing and Appellant has failed to show that there is a probability that the outcome would have been different. *See Williams*, **supra**. For all of the foregoing reasons, Appellant's first appellate issue fails.

In the second issue presented, Appellant contends that trial counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal.[4]  Appellant's Brief at 10-12.  In sum, Appellant argues:

The Commonwealth is not permitted to prove its case via speculation, conjecture and surmise.  If the Commonwealth is given every inference, [Appellant] was present at the scene when someone else did something of a criminal nature.  However, there is nothing here that would prove a conspiracy.  The Commonwealth [did] not present evidence of anything that occurred prior to the event in question and the mere fact that [Appellant] was in the presence of a perpetrator only proves that he was in the wrong place at the wrong time.  In short, [Appellant] has been convicted of [m]urder because he bought a bottle of soda and was then seen in the company of Mr. Salmond, the perpetrator.

There is nothing in the case that would prove a conspiracy.  There was nothing in the case that would demonstrate that [Appellant] was a shooter.  There is nothing in the case that would prove that [Appellant] conspired with someone to shoot another person, or rob the restaurant.  In short, and where there is no evidence to demonstrate that [Appellant] was a perpetrator[,] an[] accomplice[,] or a conspirator, it can only be concluded that there was insufficient evidence.  It is always more difficult to prove a negative than to prove something in the affirmative.  However, here, and while it is difficult to prove a negative, there is nothing in this case which would support the Commonwealth's theory that [] Appellant acted as a principal or an accomplice and,

_____

[4]  While Appellant mentions a weight of the evidence claim in framing the issue, he does not assert such a claim in his argument and fails to cite legal authority for this proposition.  Thus, we find this aspect of Appellant's current claim waived.  ***See Commonwealth v. Plante***, 914 A.2d 916, 924 (Pa. Super. 2006) ("We have repeatedly held that failure to develop an argument with citation to, and analysis of, relevant authority waives the issue on review."); ***see also*** Pa.R.A.P. 2119(a) (the argument "shall" be followed by "citation of authorities" that are pertinent). Thus, we confine our review to counsel's performance in failing to challenge the sufficiency of evidence.

accordingly, and without evidence, the verdict was based on suspicion, conjecture and surmise.

*Id.* at 11-12.

To ascertain whether this claim possesses arguable merit, we examine the sufficiency of the evidence pursuant to the following standard of review:

> [viewing the evidence] in a light most favorable to the verdict winner, [we ask whether] the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged [have been] established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.
>
> The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record. Therefore, we will not disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Knox*, 165 A.3d 925, 927 (Pa. Super. 2017) (internal citations and quotations omitted).

Conspiracy is defined as follows:

(a) Definition of conspiracy.-A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

- 12 -

18 Pa.C.S.A. § 903(a).

Our Supreme Court has held:

In order to prove the existence of a criminal conspiracy, the Commonwealth must demonstrate that the defendant: (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy. Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy.

At the heart of every conspiracy lies the common understanding or agreement between the actors. Implicit in any conspiracy is proof ... that an accused agrees to participate in the alleged criminal activity. The criminal union being prosecuted cannot be based upon an agreement to complete a broad, undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective. The *sine qua non* of a conspiracy is the shared criminal intent. Without this common purpose, a conspiracy cannot be maintained. Proving the existence of such an agreement is not always easy, and is rarely proven with direct evidence. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Indeed, a conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed.

A conspiracy cannot be established based only upon mere suspicion and conjecture. Preexisting relationships or mere association of participants, without more, will not suffice to establish a prosecutable criminal conspiracy. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to prove that a particular actor was involved in a criminal conspiracy. In other words, even a husband and a wife, a parent and a child, friends, paramours, or siblings are not, by virtue of these close relationships alone,

- 13 -

conspirators when acting in concert. The Commonwealth still must demonstrate the formation of an illicit agreement, the attendant specific shared intent to promote or facilitate the object offense, and an overt act. No level of intimacy or history between actors can replace the elements of the offense. These relationships undoubtedly can be a factor to be considered in ascertaining whether an agreement was formed between the actors, and the agreement may be proven by circumstantial evidence. Yet, without more, these relationships alone cannot serve as incontrovertible and definitive proof that an illicit agreement existed.

*Commonwealth v. Chambers*, 188 A.3d 400, 409–411 (Pa. 2018) (internal citations, quotations, and brackets omitted).

In denying Appellant relief on his ineffectiveness claim pertaining to the sufficiency of the evidence, the PCRA court concluded:

The Commonwealth presented a considerable amount of eyewitness testimony and physical evidence that [Appellant] and Qentin Salmond conspired and fatally shot Kenneth Wiggins. If appellate counsel had raised a sufficiency [] claim on appeal, the Superior Court surely would have [rejected] these claims. [Appellant] bought a bottle of soda from the Skyline Restaurant and then waited with Salmond for the victim in an alley outside. [Appellant] and Salmond then followed the victim before fatally shooting him. Robert Bluefort told police that Qentin Salmond confessed to him that he shot Wiggins. Michael Miller, who knew [Appellant] before the murder, identified [Appellant] from surveillance video from Skyline Restaurant. [Appellant's] fingerprints from his right middle finger and right ring finger were on the Mountain Dew bottle recovered from the crime scene. As such, no relief is due.

PCRA Court Opinion, 10/5/2017, at 6-7 (citation omitted).

We agree with the PCRA court's assessment and discern no abuse of discretion or error of law in denying relief on Appellant's ineffective assistance of counsel claim pertaining to the sufficiency of the evidence presented at trial. While Appellant characterizes his relationship with his co-defendant as merely

- 14 -

fortuitous, the record reveals that Appellant worked in conjunction with his co-defendant to murder the victim. Appellant and co-defendant were together for the entire altercation. Their movements were almost identical as captured by video surveillance, inside and outside of the Skyline restaurant. Both men appeared to be waiting for the victim, both confronted the victim simultaneously, and both men fled after the victim was shot. N.T., 3/6/2014, at 149-156. Officer Michael Miller, who was previously familiar with Appellant, watched the video surveillance before and during trial and confirmed, unequivocally that he immediately recognized Appellant, without outside influence from any other person, as one of the two individuals who confronted the victim on the video. N.T., 3/7/2014, at 10-13. Appellant's latent fingerprints were recovered from a bottle of Mountain Dew, which was purchased by the person Officer Miller identified as Appellant from the video surveillance. *Id.* at 39, 189-192. The victim's friend, Kerron Denmark, testified that on the day in question, a man dressed all in black approached Denmark and the victim, asked them for marijuana, and wielded a gun at them. N.T., 3/10/2014, at 64-66, 75. Denmark initially fled, but returned to help the injured victim after he heard shots fired. *Id.* In totality, the facts at trial demonstrated that Appellant had a shared intent with his co-defendant to follow, physically confront, and shoot the victim and Appellant took overt steps towards this shared criminal goal. Moreover, it does not matter which co-defendant actually fatally shot the victim, because the Commonwealth proved the conspiracy beyond a reasonable doubt each actor is responsible

- 15 -

for the substantive offenses that served as the illicit objectives of the conspiracy. Accordingly, appellate counsel was not ineffective for failing to argue that the evidence was insufficient to convict Appellant. Therefore, Appellant's second issue fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/19