J-S46015-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                          :         PENNSYLVANIA
                          :
            v.                :
                          :
                          :
DOUGLAS JOHN LAMBERT, IV.      :
                          :
         Appellant         :    No. 1054 EDA 2020

Appeal from the Judgment of Sentence Entered August 15, 2019
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000437-2018

BEFORE: BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED JANUARY 06, 2021**

Appellant, Douglas John Lambert, IV, appeals *nunc pro tunc* from the judgment of sentence of an aggregate term of 36 to 72 months' imprisonment, imposed after he was convicted of one count each of criminal use of a communication facility (18 Pa.C.S. § 7512(a)), criminal conspiracy to commit burglary (18 Pa.C.S. §§ 903(a)(1), 3502(a)(4)), criminal conspiracy to commit theft by unlawful taking (18 Pa.C.S. §§ 903(a)(1), 3921(a)), and criminal conspiracy to commit possessing instruments of crime (18 Pa.C.S. §§ 903(a)(1), 907(a)). Appellant challenges the sufficiency of the evidence to sustain his convictions. After careful review, we affirm.

Appellant's convictions stemmed from the following occurrences, as summarized by the trial court:

> Between November 18, 2017 and November 23, 2017, while incarcerated in Chester County Prison, [Appellant] orchestrated a conspiracy with three … other men, including two … who had

recently been released from the same prison, [one] of whom … had been his cell mate, in which these three other men agreed to commit a late night burglary or burglaries, as well as other offenses, against a commercial establishment or establishments located in Chester County on or about Thanksgiving night, November 23, 2017. The police were alerted to the plot through [Appellant's] recorded prison phone calls, and after further detailed surveillance, they intercepted the three … male co-conspirators in Chester County via a vehicle stop at approximately 11:30 p.m. on the night of November 23, 2017, Thanksgiving night, during which stop various tools, including ski masks, wire bolt cutters, binoculars, machetes, and other implements utilized in burglaries were found in the car. All three … co-defendants were taken into custody. No burglary was ever consummated.

Trial Court Opinion ("TCO"), 6/12/20, at 1-2 (unnecessary capitalization omitted).

The Commonwealth filed a twenty-count criminal complaint, in which it charged Appellant with criminal conspiracy to commit burglary and related offenses. *Id.* at 2. After a preliminary hearing on *habeas* motions filed by two of the co-conspirators and joined by Appellant, the trial court concluded that the Commonwealth had failed to establish a *prima facie* case with respect to several of the charges raised in the complaint; thus, the court granted the motions in part and dismissed those charges. *Id.* at 3. Following the denial of several other motions filed by the co-defendants, jury selection took place on May 7, 2019, and a trial commenced on May 8, 2019. *Id.* at 3-4.

At the close of the Commonwealth's case on May 13, 2019, all of the defendants, including [Appellant] *sub judice*, made oral motions for judgments of acquittal, which the court denied on the record in open court. At a conference or conferences between counsel and the court, the Commonwealth further whittled down the charges to be presented to the jury for adjudication. With respect to [Appellant]…, the only charges presented to the jury were[:] criminal use of a communication facility (Count III), 18

Pa.C.S.[] § 7512(a), graded as a felony of the third degree (F-3); criminal conspiracy to commit burglary (Count X), 18 Pa.C.S.[] §§ 903(a)(1), [(a)](2), 3502(a)(4), graded as an F-2; criminal conspiracy to commit criminal trespass (Count XII), 18 Pa.C.S.[] §§ 903(a)(1), [(a)](2), 3503(a)(1)(ii), graded as an F-2;[and] criminal conspiracy to commit possessing instruments of crime (Count XV), 18 Pa.C.S.[] §§ 903(a)(1)[(a)](2), 3921(a), graded as a misdemeanor of the third degree (M-3). On May 14, 2019, the jury returned a verdict against [Appellant] finding him guilty of all charges.

*Id.* at 4-5 (unnecessary capitalization omitted).

On August 15, 2019, Appellant was sentenced to the following: 15 to 30 months' imprisonment on the charge of criminal conspiracy to commit burglary (Count X); a consecutive sentence of 15 to 30 months' imprisonment on the charge of criminal use of a communication facility (Count III); and a consecutive sentence of 6 to 12 months' imprisonment on the charge of criminal conspiracy to commit possessing instruments of crime (Count XV). The charges of criminal conspiracy to commit criminal trespass (Count XII) and criminal conspiracy to commit theft by unlawful taking (Count XIII) merged with Count X for sentencing purposes. *Id.* at 5-6. Thus, Appellant received an aggregate sentence of 36 to 72 months' imprisonment.

The trial court observed that no post-sentence motion or direct appeal was filed on Appellant's behalf. *Id.* at 6. Instead, it learned that, on three separate occasions, Appellant had mailed a letter to the court: the first letter inquired about the status of the direct appeal he had asked his counsel to file; the second letter asserted that his attorney was ineffective for failing to file a direct appeal on his behalf; and the third letter requested that the court

appoint new counsel. *Id.* at 6-7. The trial court judge was not aware of Appellant's letters until receipt of the third letter, which was docketed on March 2, 2020, as the first two letters had been docketed by the Clerk of Courts but had not been forwarded to the judge's chambers. *Id.* at 7. As a result, no new counsel had been appointed. The trial court issued an order on March 3, 2020, which treated all three of Appellant's letters "as a first *pro se* PCRA [petition] filed effective January 2, 2020, the date of the postmark on the envelope in which his first letter arrived." *Id.* (citing ***Commonwealth v. Little***, 716 A.2d 1287 (Pa. Super. 1998) (regarding the prisoner mailbox rule)). The trial court appointed new counsel to represent Appellant in connection with this first *pro se* petition. *Id.*

On April 10, 2020, Appellant wrote a letter to the trial court, in which he indicated that his PCRA counsel informed him that his direct appeal rights were going to be reinstated. Appellant requested that the court appoint him new counsel to represent him in connection with his impending direct appeal *nunc pro tunc*. *Id.* On April 13, 2020, pursuant to a stipulation entered between the Commonwealth and Appellant, the trial court issued an order restoring Appellant's direct appeal rights *nunc pro tunc* and granting him 30 days in which to file an appeal. *Id.* A *per curiam* order was entered on April 14, 2020, appointing present counsel to represent Appellant in connection with his direct appeal *nunc pro tunc*. *Id.* at 8.

On April 16, 2020, Appellant timely filed a notice of appeal, in compliance with the order reinstating his direct appeal rights. After being

granted an extension of time by the trial court, Appellant timely filed a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal on June 1, 2020. Herein, he presents the following sole issue for our review:

> Was the Commonwealth's evidence insufficient as a matter of law, even when viewed in a light most favorable to the Commonwealth as the verdict winner, to sustain its burden of proving guilt beyond a reasonable doubt as to the verdicts of guilty returned by the jury for criminal conspiracy to commit burglary and other related offenses?

Appellant's Brief at 6.

We review Appellant's challenge to the sufficiency of the evidence under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder[,] unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Vargas*, 108 A.3d 858, 867-68 (Pa. Super. 2014) (internal citations omitted).

Appellant challenges the sufficiency of the evidence to support his criminal conspiracy to commit burglary conviction, as well as his conspiracy convictions on all the related offenses. He argues that the Commonwealth failed to prove that he "knowingly agreed to engage in a criminal conspiracy or 'to aid the other persons' in committing the crime of burglary." Appellant's Brief at 17 (citing 18 Pa.C.S. § 903(a)(2)). Additionally, Appellant avers that, "because there was insufficient evidence to prove [he] knowingly engaged in a criminal conspiracy to commit a crime, there is also insufficient evidence to prove [he] used a communication facility to commit or facilitate the commission of a crime." *Id.* (citing 18 Pa.C.S. § 7512(a)).

Regarding his conspiracy convictions, we note that Appellant does not raise any challenge to the sufficiency of the evidence of any of the related offenses for which he was convicted, *e.g.*, burglary, criminal trespass, and possessing instruments of crime. He solely challenges the sufficiency of the evidence to prove criminal conspiracy with respect to each crime. Thus, we deem any sufficiency claims regarding the elements of the related offenses to be waived by Appellant for failure to develop. *See Commonwealth v. Williams*, 959 A.2d 1252, 1258 (Pa. Super. 2008) (concluding that the appellant's sufficiency claim is waived for failure to properly develop the claim and to set forth applicable case law).

Section 903 of the Pennsylvania Crimes Code provides, in relevant part:

(a) **Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

…

(e) **Overt act.**—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903.

It is well-established that:

In order to prove the existence of a criminal conspiracy, the Commonwealth must demonstrate that the defendant: (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent[,] and[] (3) an overt act was done in furtherance of the conspiracy. Once the conspiracy is established beyond a reasonable doubt, a conspirator can be convicted of both the conspiracy and the substantive offense that served as the illicit objective of the conspiracy.

*Commonwealth v. Chambers*, 188 A.3d 400, 409-10 (Pa. 2018) (internal quotation marks and citations omitted).

As to the sufficiency of evidence offered to prove conspiracy, this Court has observed:

[C]ircumstantial evidence may provide proof of the conspiracy. The conduct of the parties and the circumstances surrounding

such conduct may create a "web of evidence" linking the accused to the alleged conspiracy beyond a reasonable doubt. Additionally:

> An agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

*Commonwealth v. Irvin*, 134 A.3d 67, 76 (Pa. Super. 2016) (internal citations omitted).

Instantly, Appellant argues that the Commonwealth failed to prove that he reached an agreement with his co-defendants to commit a burglary. Appellant's Brief at 20. He avers that "[t]here was no evidence presented as to what sort of agreement was made or when said agreement was reached." *Id.* He further asserts: "The Commonwealth's circumstantial evidence, consisting of cryptic phone calls, a normal nighttime drive, and everyday tools, fail to prove that [he] reached an agreement with his co-defendants to commit a burglary." *Id.* at 22. "At most," Appellant concludes, "this proves [his] association with his co-defendants and some understanding of their activities." *Id.*

Contrary to Appellant's assertions, the Commonwealth avers that the record is sufficient to establish Appellant and his co-defendants are guilty of criminal conspiracy under 18 Pa.C.S. §§ 903(a)(1), (a)(2). Commonwealth's Brief at 9. The Commonwealth further asserts that it is evident from the record that the objective of the conspiracy was burglary, *inter alia*. *Id.*

The evidence establishes that [Appellant], with the intent to commit a crime therein, concocted a scheme with [his co-defendants] whereby the [co-defendants] would enter [a] storage facility in the middle of the night of November 23, 2017[,] to commit the felony of criminal trespass, as well as the misdemeanors of possessing instruments of crime … and theft by unlawful taking.

*Id.*

In support of its argument, the Commonwealth established the following

facts at trial:

Edward P. Nolan is the custodian of records for a company known as Global Tel Link (hereinafter, "GTL"), which has contracted to provide telephone services to inmates incarcerated in Chester County Prison. Mr. Nolan retired as a lieutenant in the Internal Affairs Shooting Team at the Philadelphia Police Department after a twenty-eight … year career in law enforcement. According to Mr. Nolan, after each inmate is processed in the prison, he or she meets with a prison counselor who discusses how the inmate may access the prison phone system. Upon payment of the $85.00 booking fee, the inmate is able to utilize his or her seven … digit number to tap into the prison telephone system, which records the identity of the person making the call. Next, the inmate must tap into the system with a four … digit PIN to complete the call. The number called is also recorded by the GTL system. In order to speak with an inmate, his or her friends and/or family members also have to set up an account with GTL so that their numbers may be listed in the system. The inmates are advised by their prison counselors upon admission that each phone [c]all they make will be recorded. Additionally, at the beginning of each phone call, a recorded message is played that states that the call is being monitored and recorded by the prison. The calls are limited to ten … minutes. At the nine[-]minute mark, another recorded message plays stating that the parties have one minute left on the call. There are also instructions and papers at each of the cellblocks regarding inmates' use of the prison phone system. GTL is authorized by the Warden to share these recorded phone calls with law enforcement and members of other prisons.

During Mr. Nolan's routine monitoring of phone call activity from the prison inmates, he heard some recorded phone

conversations that he found suspicious. He described calls wherein he heard directives given to follow or try to track a certain person down. Mr. Nolan explained that he was "unsure of what the nature of the total activity was, but due to [his] suspicions, based on [his] years of experience and training, [he] knew something was outside of the ordinary." Mr. Nolan forwarded copies of these phone calls, which occurred over the course of several days, from November 18, 2017 through November 23, 2017, to … law enforcement….

TCO at 9-10 (citations to record omitted).

The contents of these phone calls are described in detail over the next nineteen pages of the trial court's opinion, *see id.* at 11-29, and are summarized as follows, along with other evidence established by the Commonwealth at trial:

In the matter *sub judice*, the police were able to listen to numerous recorded telephone calls made by [Appellant] to co-defendants[,] [William] Roussos and … Jonathan Lambert [(Appellant's brother)], both of whom had, within days of their apprehension in this matter, been released from Chester County Prison where they had served time with [Appellant]. Mr. Roussos had been [Appellant's] cell mate.

In his recorded telephone calls to Mr. Roussos, [Appellant] asked Mr. Roussos about a "situation" that they had discussed in prison and told Mr. Roussos that this "situation" was a "go[."] Mr. Roussos replied, "Thank you, sir…. I needed that[.]" This exchange suggests some agreement between the two as to the subject "situation[."] [Appellant] subsequently tells Mr. Roussos that his "people … just got out" and that Mr. Roussos should get in touch with the person who had just got [*sic*] out and explain the situation to him, because [Appellant] was unable to speak about it over the prison phone. Prison records indicate that [Appellant's] brother, Jonathan Lambert, who it may be inferred was the person to whom [Appellant] referred [to] as his "people[,"] had just gotten out of prison.

In another call, [Appellant] told Mr. Roussos that he should "[t]ake a ride past the place and figure out … what y'all gonna do[.]" This statement was part of a conversation in which

[Appellant] told Mr. Roussos that he had given his "people" an "address[."] Both of these statements, in conjunction with the previous phone calls about an unidentified situation being a "go" and Mr. Roussos['] having to speak with [Appellant's] "people" because [Appellant] could not speak about the "situation" over the prison phone system, suggests that a secretive engagement was underway between [Appellant], Mr. Roussos, and, given that Jonathan Lambert had just gotten out of prison, and as [Appellant's] brother could have been considered one of [Appellant's] "people[,"] Jonathan Lambert as well, and that this engagement involved a physical address provided by [Appellant].

On November 19, 2017[,] Mr. Roussos told [Appellant] that he was going to go out with his girlfriend, [Kelesha] Davis, at midnight to get some ice cream after the [football] game. Given that it was the end of November, and Mr. Roussos was supposedly going to wait until midnight to go out and get his ice cream, the credibility of this statement when taken at face value is low. Further, [Ms.] Davis, Mr. Roussos' girlfriend at the time, who stayed at his home the night of the November 19, 2017 Eagles game, testified that Mr. Roussos left the home in the middle of the night, that they argued about his absence when he came back, and that they never went out for ice cream that night. It is reasonable to infer, as Detective [Jonathan] Shave [of the Coatesville City Police Department] did, that Mr. Roussos' assertion was an oblique reference to an event that was known to [Appellant] and himself[,] but about which he did not want to speak directly on a recorded call.

The next day, November 20, 2017, [Appellant] called Mr. Roussos and asked him to tell him "something good." Mr. Roussos could not give him any good news, however, because, as he put it, he and another person or persons had run into some horses and an old lady and that they would need to go out again. [Tammy] Cortlessa, age 51, whose property abuts a storage facility located along Doe Run Road, testified that one night in late November 2017, her horses, [to] whom she tended every morning between 2:00 a.m. and 4:00 a.m., had been inexplicably spooked, were "freaking out[,"] "uncontrollable[,"] "out of control[,"] and refused to eat their food. Now, certainly, horses may be spooked by any number of events, but Mr. Roussos' statement that he and another person or persons went out the night before but encountered an old lady and some horses, taken in conjunction with the two men's previous conversations, permits the reasonable inference, given Ms. Cortlessa's close proximity to a

commercial storage establishment securing other people's personal property, that Mr. Roussos and another person or persons, of whom at least one was likely Jonathan Lambert, had followed [Appellant's] advice to go to a particular location, the address of which had been supplied by him, [to] scout it out, and [to] get a feel for what needed to be done.

In the morning of the following day, November 21, 2017, [Appellant] and Mr. Roussos discussed Mr. Roussos' concern about the effect of his impending ankle monitor upon his ability to move. Mr. Roussos told [Appellant] that he had an appointment to meet with his probation officer and would be getting the ankle bracelet, which he stated was concerning because it would impair his ability to move freely. Mr. Roussos' first meeting with his probation officer was scheduled for November 21, 2017. Mr. Roussos did not get his ankle monitor that day[;] however, it was deferred until Monday of the following week, after Thanksgiving. Mr. Roussos told [Appellant] the placement of his ankle monitor would occur the following week when [Appellant] called him again later that evening. During this latter phone call, [Appellant] also discussed with Mr. Roussos the idea that Mr. Roussos should "do it like a doggy door" so that "it" would look like it was "back sealed again" and would therefore arouse "no suspicion." It would be unlikely that there would need to be a discussion of creating something "like a doggy door" unless the subject of the discussion was the creation of an aperture in a structure of sorts, and there would be no need to do so to make the structure appear "back sealed again" in order to avoid arousing "suspicion" if one's purpose in making the aperture were not illicit.

On November 22, 2017, [Appellant] placed a call to his brother, Jonathan Lambert, wherein the two discussed their belief that the night of November 22, 2017[,] was the "best night" to carry out the "plan" that Jonathan Lambert assured his brother was "already in motion." Later that night, [Appellant] placed another call to … Jonathan…, who in an agitated fashion, expressed reservations about the integrity of [Appellant's] "man[,"] whom it may be inferred was Mr. Roussos and whom Jonathan … said was "wiggin" and acting like he did not want to "do it tonight or … at all." Jonathan … said that he … was going to take two young men, "Lil Lee or Lil Prince[,"] with him and do the job himself, if [Appellant] would only give him "the green light." [He] indicated that one of the young fellows would act as a look-out while the other one would "go in" with him. Detective Shave testified as to how he was able to determine that the

reference to "Lil Lee" meant the fourth co-defendant, Lee Fitzgerald Wilson, who just happened to have a brother by the name of Princeton. The fact that Jonathan Lambert was suggesting that one of the young men would act as a look-out in the matter suggests that Jonathan['s] … purpose was nefarious; one does not need to employ a look-out unless one is trying to hide something. Finally, Jonathan['s] … deference to [Appellant], as shown by his request that [Appellant] give the "green light" to him to "do it" himself, permits the reasonable inference that [Appellant] was in control of the enterprise and orchestrating events from his prison cell.

On November 23, 2017[,] [Appellant] called Mr. Roussos and asked him what had happened the night before. Confused by [Appellant's] reference to the previous night, Mr. Roussos asked him[,] "What part?" [Appellant] replied, "Really?" and Roussos responded, "We always said we were going to do it today[,] on Thanksgiving." [Appellant] called his brother a few hours later, who confirmed that "[t]onight is on." November 23, 2017 was Thanksgiving night. These exchanges demonstrate that [Appellant], Jonathan Lambert, and William Roussos were the principals behind an as[-of-]yet undisclosed but certainly deducible event that was to occur on Thanksgiving night[,] and that all three knew each other and had been in communication with each other. They support the Commonwealth's theory of conspiracy.

Later[,] on the night of November 23, 2017, [Appellant] call[ed] … Jonathan…, several times to tell him, among other things, to be careful, that he was thinking about him, and to make sure that he has his "dancing shoes" on and that he is "dress[ed] correctly for the dance."

Police surveillance established that [Appellant's] three … co-conspirators, William Roussos, Jonathan Lambert, and Lee Fitzgerald Wilson, a/k/a "Lil Lee[,"] met up with each other at Jonathan Lambert's house on Thanksgiving night[,] 2017. The police saw all three … men enter Mr. Roussos' Jeep. The police followed the men as they made their circuitous tour of Coatesville. The police observed that the route the co-conspirators traveled took them right past a storage facility located on Doe Run Road[,] next to Ms. Cortlessa's horse farm. Although it is true that the men drove past the storage facility and did not stop, Detective Shave suspected, based on all of the phone conversations he had listened to and the surveillance he had conducted over the course

- 13 -

of two nights, as well as on his training and experience, that the men were attempting to evade police[,] and that if they were successful in that attempt, they would be able to consummate their goal, which he believed, from his review of [Appellant's] recorded prison phone calls and surveillance of his co-conspirators, to be burglary, a felony of the second degree (F-2). The circuitous nature of the route traveled, coupled with the absence of a destination, lends support to the theory that the men were scoping out an appropriate target, likely the storage facility given their previous encounter with Ms. Cortlessa's property[,] as discussed earlier, and [that they] did perhaps suspect … they were being tailed by law enforcement.

After Mr. Roussos made a turn signal violation at the location of Snake Road/Newlinville Road and drove into the opposing lane of traffic in the 300 block of Valley Road, Detective Shave made a decision to stop Mr. Roussos' vehicle. After the vehicle stopped, all three men, who were wearing dark clothing, were taken out of the car and detained. When Mr. Roussos was removed from the Jeep, a stun gun fell on the ground. Although Mr. Roussos is an airplane/helicopter mechanic by trade, a stun gun, which is a prohibited offensive weapon, 18 Pa.C.S.[] § 908(a)-(c), is not the sort of tool one might typically utilize in the performance of such a job.

Through a subsequent consensual search of Mr. Roussos' car, the police found latex gloves, wool gloves, multiple flashlights, a bolt cutter, book bags, pin snips, crowbars[,] and machetes. They also found articles of clothing, binoculars, nylon gloves with hard knuckles, pliers, knives, screwdrivers, hammers, pole cutters, metal cutters, a generator, USB cords, batteries[,] and jewelry. Not all of these tools, such as the machetes, the binoculars, and perhaps the nylon gloves with the hard knuckles, appear to be items that would regularly be employed in a mechanic's trade. All of them, however, would be helpful if one is trying to commit a burglary. In his **Mirandized**[1] interview with the police, Mr. Roussos told the detectives that he had "heard" that the "target" of the men's enterprise was a storage locker.

*Id.* at 45-51 (unnecessary capitalization and emphasis in original omitted).

Based on the foregoing, the trial court opined:

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 14 -

All of these facts, when taken together, viewed in the light most favorable to the Commonwealth, and combined with the reasonable inferences that may be derived therefrom in the Commonwealth's favor, … indicate that [Appellant], from his prison cell, was orchestrating the burglary of the self-storage facility located next to Ms. Cortlessa's property, a crime which is a felony of the second degree (F-2), and [he was] doing so from behind the scenes by arranging and securing the cooperation of his two co[-]defendants, via telephone, who then brought in a third party known to [Appellant]. Jonathan Lambert's request for the "green light" from [Appellant] supports the conclusion that [Appellant] was the puppet master in this scheme and was controlling events from behind the prison walls.

*Id.* at 51 (unnecessary capitalization omitted). The trial court elaborated:

All of the parties' recorded phone calls, together with the co-perpetrators' joint presence in Mr. Roussos' car on the appointed night of November 23, 2017, a few days after they aborted a previous mission because they encountered "horses" and an "old lady" who was acting "weird," and their act of driving in a circle which encompassed a storage facility that was located off of one of the roads they traveled in Coatesville and which just happened to abut a horse farm with a 51 year-old female proprietor, all while possessing numerous implements, including a stun gun, binoculars, and machetes, that could be utilized to break into a building, when taken in light of Mr. Rousses' admission to [the] police that the target of the men's activities was [] in fact a storage shed, is not only sufficient when viewed in the light most favorable to the Commonwealth, to establish the overt act and the parties' nefarious purposes, but to establish that [Appellant], with the intent of promoting or facilitating the burglary, agreed with another person or persons that they or one or more of them would engage in conduct which constitutes the crime of burglary or an attempt or solicitation to commit that crime and that [Appellant], again with the intent of promoting or facilitating a burglary, not only agreed to but actually did aid another person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime, at least in party by bringing the co-conspirators into contact with each other and directing them as to what to do and when, so as to satisfy the Commonwealth's

burden under 18 Pa.C.S.[] § 903(a)(1), [(a)](2)[,] beyond a reasonable doubt.[2]

*Id.* at 54-55 (unnecessary capitalization omitted). We deem the trial court's findings to be well-supported by the record and, thus, we conclude that the trial court reasonably found the elements of criminal conspiracy were met.[3]

Finally, Appellant argues that there was insufficient evidence to sustain his conviction for criminal use of a communication facility. Section 7512(a) of the Crimes Code states that "[a] person commits a felony of the third degree if that person uses a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title[.]" 18 Pa.C.S. § 7512(a). Appellant does not dispute that the underlying crimes are felonies. His sole contention here is that, if this Court concludes that the evidence is insufficient to sustain his conspiracy convictions, then we must also conclude that the evidence is insufficient to sustain his conviction for criminal use of a communication facility.

Having determined that there was sufficient evidence to sustain his conspiracy convictions, Appellant's argument fails. Nevertheless, we further note that the evidence was sufficient to sustain the conviction for criminal use

_____

[2] "It is of no moment that the conspirators' efforts to commit the crime of [b]urglary were thwarted by the police." *Id.* at 58. "This is not renunciation. In order to be effective as a renunciation, the withdrawal from criminal activity must be voluntary. 18 Pa.C.S. § 903(f). Police apprehension does not constitute a voluntary withdrawal on the part of the co-conspirators." *Id.*

[3] We note that the record also supports Appellant's convictions of the related offenses; however, we need not address whether the elements of each of the related offenses has been met, as any sufficiency claims regarding the related crimes have been waived.

of a communication facility. The record clearly establishes that Appellant used the prison phone to communicate with his cohorts in furtherance of his felonious efforts to orchestrate the burglary of a self-storage facility. Based on the foregoing, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Musmanno joins this memorandum.

Judge Shogan concurs in the result.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

Date: *1/6/2021*