J-S25040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES LEONARD MURPHY | : | No. 352 EDA 2021 |

Appeal from the Order Entered January 14, 2021
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0002232-2020

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:        **FILED OCTOBER 4, 2021**

The Commonwealth of Pennsylvania appeals form the January 14, 2021

order of the Court of Common Pleas of Chester County (trial court) granting

James Leonard Murphy's (Murphy) petition for *habeas corpus* and dismissing

all charges against him. The Commonwealth argues that the trial court erred

in finding that it had not established a *prima facie* case in support of the

charges of dealing in proceeds of illegal activities, bribery and conspiracy. We

affirm.

**I.**

We glean the following facts from the certified record. Beginning in

2017, Murphy and several co-conspirators were investigated for their

---

[*] Retired Senior Judge assigned to the Superior Court.

involvement in providing security services to Sunoco in connection with the company's Mariner East Pipeline Project (MEPP). As a result of the investigation, Murphy was charged by information with the following offenses:

- 3 counts of dealing in proceeds of unlawful activities,[1] with 1 count for each of the 3 subsections of the statute;

- 27 counts of criminal conspiracy[2] to commit the crime of dealing in proceeds of unlawful activities;

- 2 counts of bribery in official and political matters,[3] with 1 count for each of 2 subsections of the statute;

- 10 counts of criminal conspiracy to commit the crime of bribery; and

- 7 counts of criminal conspiracy to commit restricted activities—conflict of interest.[4]

Murphy proceeded to a preliminary hearing on August 13, 2020.[5] The Commonwealth presented testimony from two witnesses as well as two videos and several documents from its investigation.

---

[1] 18 Pa.C.S. §§ 5111(a)(1)-(3).

[2] 18 Pa.C.S. § 903.

[3] 18 Pa.C.S. §§ 4701(1) & (3).

[4] 65 Pa.C.S. §§ 1103(A).

[5] Murphy's case was consolidated with co-defendant Richard Lester (Lester) at the preliminary hearing. Lester passed away before the hearing on Murphy's *habeas corpus* petition.

Dan Zegart (Zegart), a journalist who worked for the Climate Investigation Center, was the first witness at the preliminary hearing. On June 5, 2018, Zegart was in Chester County interviewing residents for an article on the MEPP. He went to the Lisa Drive construction site for the MEPP to learn more about sinkholes that had been reported in residents' yards.

While Zegart was parked on the side of the road and writing notes, he saw a hard-hatted worker nearby taking pictures of him and photographing his license plate. Zegart got out of his vehicle to speak to the man and recorded their conversation with his cell phone camera.[6] He asked the man if he was working for a security firm or a pipeline contractor, and the man responded that he was working for both. He then pointed Zegart to another man standing nearby and said he could answer any questions about security on the site. He told Zegart that the man was a state constable.

Zegart went over to speak to the man, who told him not to step off the street and onto the property. The man had a badge on his hip and an insignia on his shirt and he told Zegart that he was recording their interaction. Zegart could not recall whether the man had a firearm. He refused to answer any questions about security on the site. At that point, another worker in a hard-hat approached Zegart and gave him a phone number to call with any

---

[6] The Commonwealth introduced Zegart's video as an exhibit at the hearing.

questions about site security. He then told Zegart he would call the police to have him arrested for harassment if he did not leave.

The second witness at the preliminary hearing was Detective Ben Martin (Detective Martin) of the Chester County Detectives. Detective Martin began investigating the MEPP in December 2018 after receiving complaints from residents related to property damage, fraud, the permitting process and other issues with the project. Detective Martin also received reports that Sunoco had hired state constables to work security for the project.

In January 2019, Detective Martin received a report of a sinkhole on Lisa Drive. He went to the location and was photographing the sinkhole from his vehicle when Constable Mike Robel (Constable Robel) knocked on his window, identified himself as a state constable and told him that he could not be parked in that area. Detective Martin told him he would leave when he was done. At that time he was parked on the public street.

Detective Martin then left the area, confirmed that Constable Robel was, in fact, a constable and returned with a uniformed officer from the local police department to speak with him again.[7] When he asked Constable Robel who he was working for, he responded that he was a subcontractor working for Murphy. Constable Robel said he was not being paid by the court system for

_____

[7] The officer recorded this conversation with his vehicle's dash camera and the Commonwealth introduced the video into evidence at the preliminary hearing.

- 4 -

his security work at the site but that he was supposed to appear in uniform and that Sunoco was looking for certified constables. Detective Martin told him that he could not use his badge or authority as a state constable when working a private security detail. He testified that Constable Robel was wearing a duty belt with a handgun, his badge, a shirt that said "constable" and a hat with the constable symbol on it.

Detective Martin explained that the MEPP transported natural gas liquids in part through existing crude pipelines in the Chester County area. The project required retrofitting and construction to adapt for the natural gas liquids. Over time, several companies and subsidiaries were involved in the project, including Sunoco Logistics, Sunoco L.P. and Energy Transfer Partners (collectively, Sunoco). Sunoco contracted with TigerSwan, a national security company, to provide security services for the project. A project manager from TigerSwan, Nik McKinnon (McKinnon), coordinated with Sunoco's head of security, Frank Recknagel (Recknagel), and a local Site Security Supervisor, Michael Boffo (Boffo), in Chester County to provide security at Lisa Drive.

Detective Martin then presented emails from Recknagel that he had obtained during his investigation. In one email, Recknagel told several individuals involved with the MEPP that he was working to get licensed, armed state constables to provide security at the construction site. In another email, a TigerSwan employee asked if off-duty police officers could be used for the security positions. Recknagel responded that the site required an armed detail

and the "unwritten policy" was to use on-duty law enforcement or sheriffs or constables. In another email, McKinnon sent Recknagel Murphy's contact information and a PDF of a private detective bond in Lester's name. McKinnon recommended hiring Murphy for the project.

During his investigation, Detective Martin spoke with several other constables who had been hired to work security at the Lisa Drive construction site for the MEPP. He interviewed Constable Norris and Constable Tyrone Harley, both of whom identified Murphy as the individual they were working for on the MEPP site. Constable Harley told Detective Martin that he was being paid by Raven Knights, LLC. Based on business records and his interviews with the constables, Detective Martin testified that Raven Knights, LLC was owned by co-defendant Lester and operated by Murphy. Bank records showed that the constables were paid in the name of Raven Knights, LLC and Lester.

However, the constables Detective Martin interviewed said that they always dealt with Murphy and Murphy's name was on emails related to the constables hired for the Lisa Drive site. Murphy also responded to document requests from the Department of Homeland Security related to Raven Knights, LLC. The Commonwealth introduced into evidence two emails from McKinnon to Recknagel in March and April 2018 identifying two constables who were added to security at Lisa Drive. The first email said the constable was from Raven Knights, LLC. The second email stated that Murphy was adding the constable as additional support at the site. Murphy was not listed as an owner,

officer, partner or employee of Raven Knights, LLC in any legal records Detective Martin reviewed.

Detective Martin testified regarding records from Raven Knights, LLC's bank account. He found that JAB Inspections, Otis Eastern[8] and TigerSwan were the three main sources of income into the account. He found two types of checks written out of the account. The first had "Off Duty Services" typed on them and appeared to be payroll checks made through a computer program. The second were general handwritten small business checks with "Raven Knights" on them. Detective Martin found approximately 20 different state constables who had received checks from the account. He testified that although there was some crossover, for the most part, the constables received the handwritten checks and other individuals received the typed checks. Lester's name and signature was on the account application for the Raven Knights, LLC account. Numerous checks had been made out to Lester, Murphy and Boffo. The bank account had received approximately $800,000 from the companies associated with the MEPP and had paid thousands of dollars to various constables. Detective Martin testified that some of the constables had been paid $25,000 to $30,000 a year from the account.

---

[8] JAB Inspections and Otis Eastern were construction companies working on the MEPP.

For comparison, the Commonwealth entered into evidence two checks paid to Constable Tyrai Anderson for $600 and $1,200, respectively. The first check was typed and had "Off Duty Services" printed on it. It was dated in December 2017. The second check was handwritten, had "Raven Knights" printed on it and was dated in February 2018. Both checks were signed by Lester. Constable Anderson had petitioned to become a state constable in January 2018 and was appointed by the court in March 2018. He obtained a constable bond in April 2018.

Detective Martin further explained that state constables are required to file an annual statement of financial interest to report any additional income with the Pennsylvania Ethics Commission. He reviewed the 2017 and 2018 filings for the constables he had identified from the Raven Knights, LLC bank account. The Commonwealth introduced one statement of financial interest from 2018 by a constable who had received checks from the Ravens Knights, LLC account. The constable had not reported that income. Detective Martin also reviewed 1099 forms for Raven Knights, LLC's employees. Some of the constables were not on the 1099 forms and did not receive 1099 forms for the work they performed.

The magisterial district judge held all the charges for court. Murphy subsequently filed a motion for writ of *habeas corpus* seeking dismissal of the charges. At the hearing on the motion, the parties stipulated to the transcript of the preliminary hearing and the exhibits submitted by the Commonwealth

at the preliminary hearing. No new evidence was introduced. After briefing on the matter, the trial court held that the Commonwealth had failed to adduce *prima facie* evidence to support any of the charges against Murphy and entered an order of dismissal. The Commonwealth filed the instant timely appeal and it and the trial court have complied with Pa.R.A.P. 1925.

## II.

The Commonwealth raises one issue on appeal: whether the evidence submitted at the preliminary hearing established a *prima facie* case to support all charges against Murphy.[9] It contends that Murphy, along with Lester and through Raven Knights, LLC, hired constables to provide private security for Sunoco and recruited them to use their badges and authority as state constables to further Sunoco's interests. It further argues that Murphy aided Raven Knights, LLC in issuing paychecks and in failing to document the work the constables performed to shield them from income reporting requirements. It asserts that state constables are not permitted to use their authority in this way and, as a result, it has established a *prima facie* case that Murphy engaged in dealing in the proceeds of unlawful activity, bribery and conspiracy by facilitating this enterprise.

---

[9] Whether the Commonwealth's evidence makes out a *prima facie* case is a question of law for which the scope of review is plenary. **Commonwealth v. Karner**, 193 A.3d 986, 991 (Pa. Super. 2018).

Our Supreme Court has summarized the Commonwealth's burden at the preliminary hearing as follows:

> [A] *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense. Furthermore, the evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury. . . . The weight and credibility of the evidence are not factors at the preliminary hearing stage, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. . . .
>
> [I]nferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case. The use of inferences is a process of reasoning by which a fact or proposition sought to be established is deduced as the logical consequence from the existence of other facts that have been established. The "more-likely-than-not" test must be applied to assess the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability. The more-likely-than-not test is the minimum standard — anything less rises no higher than suspicion or conjecture.

**Commonwealth v. Perez**, 249 A.3d 1092, 1102-03 (Pa. 2021) (cleaned up). With these standards in mind, we turn to the merits of the Commonwealth's claims.

## A.

The Commonwealth's first argument addresses the dismissal of two counts of bribery in official and political matters:

> **(a) Offenses defined.**--A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;

\*\*\*

(3) any benefit as consideration for a violation of a known legal duty as public servant or party official.

18 Pa.C.S. §§ 4701(1) & (3).  Murphy was also charged with ten counts of conspiracy to commit bribery.  18 Pa.C.S. § 903.  To sustain a conviction for conspiracy, "the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." ***Commonwealth v. Fisher***, 80 A.3d 1186, 1190 (Pa. 2013) (citation omitted); 18 Pa.C.S. § 903(a).

Here, the parties dispute whether constables are "public servants."  The Crimes Code defines a public servant as "[a]ny officer or employee of government, including members of the General Assembly and judges, and any person participating as juror, advisor, consultant or otherwise, in performing a governmental function; but the term does not include witnesses."[10]  18 Pa.C.S. § 4501.  This Court has previously held that constables are not

---

[10] While the Commonwealth cites to the definition of "public official" under the Public Official and Employee Ethics Act, 65 Pa.C.S. § 1102, the article of the Crimes Code for "Offenses Against Public Administration" sets forth the above definition of public servant for the purposes of the bribery statute, 18 Pa.C.S. § 4501.

"government employees," as they work as independent contractors and are compensated on a per-job basis. **Commonwealth v. Rodriguez**, 81 A.3d 103, 107-08 (Pa. Super. 2013). "No one supervises constables in the way a police chief supervises police officers or a sheriff supervises deputies. No municipality is responsible for their actions in the way a city, borough, or township is responsible for its police or a county is responsible for its sheriff's office." **Id.** (quoting **Commonwealth v. Roose**, 690 A.2d 268, 269 (Pa. Super. 1997), *aff'd*, 710 A.2d 1129 (1998)); **see also Ward v. Dept. of Transp., Bureau of Motor Vehicles**, 65 A.3d 1078, 1082 (Pa. Cmwlth. 2013) (holding that constables are not government or quasi-governmental entities under the Vehicle Code). A constable's duties are limited by statute and include actions such as preserving the peace at election sites, service of process, collection of taxes and arrests for breach of the peace. **See** 44 Pa.C.S. §§ 7151-59. A county is not liable for a constable's actions under the doctrine of *respondeat superior*. 44 Pa.C.S. § 7142(e).

Based on these authorities, constables cannot be considered "public servants" under the definition of the term that applies to the bribery statute. They are not government employees or officers but rather are independent contractors who perform some judicial duties on a per-job basis. **See Rodriguez**, **supra**; 44 Pa.C.S. §§ 7161-66 (related to compensation of constables). Because they are not public servants, the Commonwealth did not adduce *prima facie* evidence that Murphy offered a pecuniary benefit in

exchange for an exercise of discretion by a public servant, *see* 18 Pa.C.S. §§ 4701(1), or any benefit in exchange for a violation of a public servant's legal duty, 18 Pa.C.S. §§ 4701(3), by paying constables to work as security for the MEPP construction site.

The Commonwealth cites to Constable Policies, Procedures and Standards of Conduct promulgated by the Administrative Office of Pennsylvania Courts (AOPC) in accordance with Pa. R.J.A. 1907.2 ("The Court Administrator shall establish uniform policies, procedures and standards of conduct for constables who perform services for the courts. These policies, procedures and standards of conduct shall be mandatory. . . ."). These standards state, *inter alia*, that a constable "shall not lend the prestige of his or her office to advance the private interests of others." **See** Constable Policies, Procedures and Standards of Conduct, at 9 (May 2013), *available at* https://www.pccd.pa.gov/training/Documents/Constable%20Education%20and%20Training/New%20Supreme%20court%20rules%20for%20Constables%205-29-13.pdf. It also cites to the Pennsylvania State Constables Association's Code of Ethics in support of its position that a constable may not use his authority in furtherance of private interests. **See** Code of Ethics, Pennsylvania State Constables Association, *available at* https://www.pscaconstable.org/code-of-ethics.

The Commonwealth's reliance on these authorities is misplaced. While they may demonstrate that the constables involved in the MEPP security

project violated professional standards or ethics, they do not establish that the constables are public servants for the purposes of the bribery statute. In fact, the Constable Policies, Procedures and Standards of Conduct specifically states that constables are "independent contractors, statutorily authorized to perform services for the courts," and that the policies are not intended to "create an employer/employee relationship between the courts and constables." *See* Constable Policies, Procedures and Standards of Conduct, at 3. Because we conclude that constables are not "public servants" for the purposes of the bribery statute, the Commonwealth did not adduce *prima facie* evidence that Murphy committed the crimes of bribery or conspiracy to commit bribery.

**B.**

Next, Murphy was charged with one count of dealing in proceeds of unlawful activities under each of the statute's subsections:

> **(a)  Offense defined.**--A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:
>
> (1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.
>
> (2) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity and that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.

>        (3) To avoid a transaction reporting requirement under
> State or Federal law.

18 Pa.C.S. §§ 5111(a)(1)-(3).  The statute defines "unlawful activity" as an activity graded as a first-degree misdemeanor or higher.   18 Pa.C.S. §§ 5111(f).  A "financial transaction" is the movement of funds by wire or other monetary instrument.  *Id.*  Murphy was also charged with 27 counts of conspiracy to commit dealing in proceeds of unlawful activities.

The Commonwealth's sole argument with respect to these charges is that Murphy dealt in the proceeds of illegal activities by bribing constables to use their status as public officials to the benefit of Sunoco.  Because bribery is graded as a third-degree felony, the Commonwealth contends there was *prima facie* evidence to show that Murphy engaged in unlawful activity under the statute by facilitating the use of constables at the MEPP site and paying them through Raven Knights, LLC with funds received from Sunoco and other companies related to the MEPP.  However, as we have concluded that Murphy did not engage in bribery, this argument is meritless.

Subsection (a)(3) of the statute prohibits an individual from conducting a financial transaction to avoid a transaction reporting requirement under federal or state law.  18 Pa.C.S. §§ 5111(a)(3).  The Commonwealth's sole argument related to this count consists of two sentences without citation to the record or legal authority:  "Moreover, in paying constables off-payroll, [Murphy] attempted to avoid reporting requirements.  [Murphy] intended to conceal or disguise the nature of the proceeds, as transparent accounting,

would expose his illegal financial operations." ***See*** Commonwealth's Brief at 29-30. The Commonwealth has waived this argument for failure to adequately develop it in accordance with the briefing requirements on appeal. ***See Commonwealth v. Pi Delta Psi, Inc.***, 211 A.3d 875, 883 (Pa. Super. 2019); Pa. R.A.P. 2119(a).

Moreover, the evidence of Murphy's involvement in the payments to the constables was scant and did not rise above mere "suspicion and conjecture" not sufficient to state a *prima facie* case. ***See Perez***, ***supra***. All of the checks and banking documents admitted into evidence were signed by Lester, not Murphy. Detective Martin further testified that he did not find any legal documentation listing Murphy as an owner, officer or partner of Raven Knights, LLC, and he was not listed as an owner on the related bank accounts. While Detective Martin testified that Murphy provided the Department of Homeland Security with documentation related to Raven Knights, LLC's 1099 forms, there was no evidence that Murphy was responsible for preparing those documents or the payroll checks. Accordingly, no relief is due.

## C.

Finally, Murphy was charged with seven counts of criminal conspiracy to engage in restricted activities—conflict of interest.[11] As explained ***supra***, a

---

[11] The Commonwealth's argument on these counts also refers to the subsection of the restricted activities statute for accepting improper influence, 65 Pa.C.S. § 1103(c). ***See*** Commonwealth's Brief at 34-38. However, the
*(Footnote Continued Next Page)*

criminal conspiracy requires proof of an agreement to commit or aid in the commission of an unlawful act, shared intent between co-conspirators and an overt act in furtherance of the conspiracy. *Fisher*, *supra*. Thus, all conspiracies are based upon a "common understanding or agreement" between the participants and "the mutual specific intent to carry out a particular criminal objective." *Commonwealth v. Chambers*, 188 A.3d 400, 410 (Pa. 2018) (citations omitted). A relationship or association between the actors alone is insufficient to prove that such an agreement existed. *Id.*

The Public Official and Employee Ethics Act (Ethics Act) provides that "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). A violation of this subsection constitutes an ungraded felony punishable by up to five years in prison and a $10,000 fine. 65 Pa.C.S. § 1109(a). The statute defines a "conflict of interest" as "[u]se by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself. . . ." 65 Pa.C.S. § 1102. It further defines "authority of office or employment" as the "actual power provided by law, the exercise of which is necessary to the

_____

criminal information only listed restricted activities—conflict of interest as the objective of the conspiracy counts. *See* Criminal Information, 8/26/20, at 3-4. Therefore, we confine our analysis to that charge.

- 17 -

performance of duties and responsibilities unique to a particular public office or position of public employment." *Id.*

A public official is "[a]ny person elected by the public or elected or appointed by a governmental body or an appointed official in the executive, legislative or judicial branch of this Commonwealth or any political subdivision thereof. . . ." *Id.* It is undisputed that constables are elected, 44 Pa.C.S. §§ 7111-14, or appointed in the event of a vacancy during the constable's term, 44 Pa.C.S. § 7121. Deputy constables are appointed by the constable subject to approval by the court of common pleas. 44 Pa.C.S. § 7122. In addition, the Commonwealth points out that constables are required by the State Ethics Commission to file statements of financial interest under the Ethics Act. *See* Information for New Constables and Deputy Constables, PCCD, Constables' Education and Training Board, at 15-17 (April 2020), *available at* https://www.pccd.pa.gov/training/Documents/Constable%20Education%20and%20Training/2020%20NEW%20CONSTABLE%20GUIDE.pdf. Therefore, constables meet the definition of a public official for the purposes of the Act.

The Commonwealth argues that the constables who worked as security for the MEPP committed the substantive violation of the Ethics Act by using their badges, titles and authority in exchange for payment from Sunoco and facilitated by Raven Knights, LLC. It concludes that by recruiting the

constables and providing them with paychecks from Raven Knights, LLC, Murphy conspired to aid the constables in violating the Ethics Act.

The Commonwealth's argument related to the substantive violations of the Ethics Act is predicated on what it refers to as "the apparent authority of a constable" and "a deployment of apparent law enforcement power." *See* Commonwealth's Brief at 38. In essence, it contends that when the constables wore badges and insignias and carried firearms during their security work, they were demonstrating official authority to perform actions such as telling citizens where they could park on the public street. However, the statute defines the use of authority or office as "*actual* power provided by law," not the use of apparent authority allegedly deployed here. 65 Pa.C.S. § 1102 (emphasis added). The Commonwealth does not argue that the constables used any authority actually granted to them by statute during their security work on the MEPP, only that they presented themselves as having authority over citizens. *See Roose*, *supra* (holding that constables do not have the authority to stop a vehicle and effectuate an arrest for violations of the Motor Vehicle Code).

In fact, Zegart's testimony and the corresponding video of his interaction at the Lisa Drive construction site depicted a hard-hatted construction worker warning him that he would call the police for "harassment" if Zegart did not leave the site. This appeal to the authority of the police rather than the constable who was standing by demonstrated that

the constable was not on site to exercise any law enforcement authority. The constable did nothing more than tell Zegart not to step off the public street and onto the private property. This action was consistent with employment as private security but not with the statutory powers of a constable. **See** 44 Pa.C.S. § 7155 (allowing constables to arrest trespassers on any forest or timber land under limited circumstances); 44 Pa.C.S. § 7158 (allowing constables to arrest individuals in limited circumstances such as breach of peace or endangering property). Because the record does not demonstrate that the constables used the "authority of office or employment" to further their pecuniary interests while working as security on the MEPP, the Commonwealth did not set forth *prima facie* evidence that Murphy conspired to allow them to do so.[12] Accordingly, this claim is meritless.

Order affirmed.

President Judge Emeritus Bender joins the memorandum.

Judge McLaughlin concurs in the result.

---

[12] The trial court dismissed these charges because it found no evidence that Murphy conspired to commit the violations of the Ethics Act by carrying out his duties as an employee of Raven Knights, LLC. "To the extent our legal reasoning differs from the trial court, we note that as an appellate court, we may affirm on any legal basis supported by the certified record." *Commonwealth v. Williams*, 125 A.3d 425, 433 n.8 (Pa. Super. 2015).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/4/2021</u>